BUTLER *v.* PERRY ET UX.

[No. 204, October Term, 1955.]

*Decided June 15, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Michael F. Freedman* and *John B. Fox* for appellant.

*Walter V. Harrison* with whom was *Morgan L. Amaimo* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

Almost always there is some doubt in a custody case as to what is best for the child; in many cases it is difficult in the extreme to come to a conclusion that seems satisfyingly wise and sound. The case before us is in the latter category.

Warren Scott, III, the boy over whom paternal grandparents, who live in Pittsburgh, and the maternal grandmother who lives in Baltimore, are contesting, was born in Baltimore in 1950. His mother was Marjorie Butler, daughter of Ruth Butler, the appellant. His father was Warren Scott, Jr., son of Ruth Perry by a former marriage. Ruth Perry and her present husband are the appellees, the chancellor having awarded custody of the boy to them. Marjorie Butler and Warren Scott, Jr., lived together as man and wife for several years, although they were never married, perhaps because he had a wife from whom he had not been divorced. Warren Scott, III, lived with his parents in Baltimore until 1951 when the family went to Pittsburgh to stay with Mr. and Mrs. Perry. Later they had their own apartment in Pittsburgh and three months before her death, Marjorie Butler left Warren Scott, Jr., and went to live in her own apartment. The Perrys say that they supported the child to a large extent all the time he was in Pittsburgh, although the record shows that the child did not live with them continuously, having lived with his parents and then with his mother much of the time. In 1953, Warren Scott, Jr., murdered Marjorie Butler with a knife in an atrociously brutal and horrible killing, while his son was sleeping nearby. He

is serving a sentence in the Penitentiary. Ruth Butler, the grandmother, went to Pittsburgh at that time and brought little Warren back to Baltimore with her. The Perrys say that she abducted him. She says that she acted under the advice of the Legal Aid Bureau of Pittsburgh. Warren has been with his grandmother in Baltimore since September 29, 1953. Ruth Butler has been unable to work since 1945 because of high blood pressure and lives on public assistance, receiving $70.00 a month at the present time. Warren receives survivor's benefits from his mother's Social Security protection of $30.00 a month. Ruth Butler and Warren live in a third floor apartment at 1707 W. Lexington Street with her sister and her sister's husband, Mr. and Mrs. Hart. The apartment consists of two bedrooms, a combination living room and dining room, kitchenette and bath. The child is clean, well kept, happy and well loved by his grandmother and his great-aunt, and shows great affection for both of them. The Perrys live in Pittsburgh in their own home and have an income of $300.00 a month from other properties which are rented. Mrs. Perry had been employed as a typist by the Federal government and had the equivalent of three years of college. Mr. Perry, now retired, had been in the hauling business.

In April of 1954 the Perrys filed a petition in the Circuit Court of Baltimore City seeking custody of little Warren. Judge Mason referred the petition to the Juvenile Division of the Circuit Court for an investigation and report. The Director of Probation recommended in June, 1954, that the custody of Warren be awarded to Ruth Butler. The balance of his recommendation is as follows: "In making this recommendation, we are aware that we are asking the Court to place this child in a home in which the income and the physical surroundings are greatly inferior to those offered by the petitioners. The petitioners, however, are parents of the putative father of this child. The putative father is currently confined in prison for having killed the natural mother. It does not seem to us that this child ought to be reared in an environment in which he will inevitably be required

to express an affection for and an interest in the person who caused his mother's death. In the Butler home, the child appears to be secure, loved and wanted. He will be permitted to grow up without constantly being reminded of the very unpleasant circumstances of his mother's death." The detailed investigation which was attached to the letter describes Warren as "an attractive, friendly and well-mannered little boy who seems happy with his grandmother." It notes that although Ruth Butler has high blood pressure, the doctor at the University Hospital reported that there is nothing in her condition "to interfere with her properly caring for a child." The apartment in which the grandmother and the boy live is described as "moderately furnished, clean, neat and apparently well kept. * * * Warren sleeps in his own bed which is comfortable and clean. Mr. and Mrs. Hart are seemingly kind people who assist financially and physically with the care of Warren. Mrs. Hart seems to love Warren very much and he likewise loves her." Mrs. Butler is described as a woman of good character and highest morals, who does not smoke or drink. Included is a quotation from the report of the Department of Public Welfare which noted that it felt that "there seemed to be a genuine interest on Mrs. Butler's part to look after him well." The summary and recommendation advises the court that the case is under the supervision of the Department of Public Welfare as Mrs. Butler is the recipient of public assistance and the Department will give close supervision in the matter of the care of Warren Scott, III, should the court award the custody to Mrs. Butler.

We are informed that Judge Mason was about to sign an order dismissing the petition when the appellees requested a hearing in open court. The matter then went off until October of 1955. Judge Oppenheimer, who then heard the case, held it *sub curia,* pending receipt of a report from a child psychologist, Dr. Carola B. Guttmacher. Her report shows that she found Warren to be a bright child. She concluded: "It would seem advisable to let this child remain in Baltimore. He seems to have made a very good adjust-

ment both at home and at school. It will be asking too much of a five year old child to reorient himself once more to a totally strange situation. The marked difference in the economic status of the grandmothers is a factor that undoubtedly should not be disregarded. However, if the paternal grandmother is so eager to help raise this child, perhaps she would be willing to contribute to his support financially, even if Warren does not live with her. There is so little known about what kind of people the Perrys are and what their real motivations are for requesting the custody of this child, that it would seem inadvisable to send Warren to Pittsburgh at present." Thereafter, as disclosed by a memorandum he caused to be made a part of the record, Judge Oppenheimer called Dr. Guttmacher and emphasized to her that he was not trying to influence her report in any way, as he wanted her recommendation to reflect her independent judgment, but that he did suggest that she talk to Mr. and Mrs. Perry before reaching a final conclusion. Dr. Guttmacher did this and noted in her second report that she was well impressed by them and that they seem like warm, loving, intelligent people who would like to see Warren in a better environment than the one in which he is living at present. She added: "That of course is the only conscious motivation. They feel that they can provide a better home for him at present as well as improve his possibility for a better education in the future. We suspect that besides the previous reason there are other ones. For example, competitive feelings with the maternal grandmother, guilt feelings about failing to raise a successful son, etc." She concludes: "We would think it worthwhile taking chances on transplanting Warren once more from this home in Baltimore where he feels happy and secure to the home in Pittsburgh, because there we think he may have a brighter future. * * * Warren's father most likely will be paroled while Warren will still be young. He will most likely regain custody of his child and in that case Warren's adjustment will be easier if he had been in Pittsburgh with the paternal grandparents. We see some drawbacks in this plan. First of all Mr. Perry seems quite weak and looks much older than his stated age. We wonder

whether he will withstand the effort of raising an active six year old boy. Secondly, Mrs. Perry may feel rejected when Warren will show any signs of preferring to stay with his grandmother in Baltimore. It may require more than her love for this child to handle this transfer successfully."

At the hearing, Donald McNeil, who has been a probation officer for twelve years, testified that he had made the investigation that led to the report of the probation department and reiterated that he felt custody should remain with Ruth Butler, whom he found to be "a mild mannered, responsible person, a poor woman, but a woman of good habits and character. She was not known to drink and she lived a good, proper life." On cross-examination he was asked whether the fact that the Perrys were shown to be good, kind people who had a genuine affection for the child and could give him far better material care than Ruth Butler, would affect his recommendation, and he said that it would not. He added that in his opinion it would probably be better if the father remained out of the picture completely and that this would be more apt to happen if the maternal grandmother had custody than if the paternal grandparents did.

Although the father signed an affidavit that he would like his son to be with Mrs. Perry, he wrote to Ruth Butler several months after the signing of the affidavit, asking her forgiveness as far as possible, expressing his deep love for his son and, in essence, saying that he wanted whatever was best for the boy. He speaks of the fact that there will be court proceedings instituted in the near future as to the custody of Warren and adds: "Knowing you, Mrs. Butler, I'm sure that you have, within your heart, nothing short of the best intentions, concerning his future. * * * All that I can say about this is to search your heart and then do what you feel is the right thing. Little Warren's future lies within the hands of all of you. He belongs to all of you and his life deserves to be one of happiness. * * * Take care of him and give him an abundant amount of love and affection. This, I know, you will do. Use discretion and do the best that you can for him."

Judge Oppenheimer found that both the Perrys and Mrs. Butler were "good, kindly people" who were trying with all the means at their disposal to bring happiness to the child. He found Mrs. Butler to be deeply devoted to Warren and said: "I would not want to see the fine relationship between her and Warren disturbed in any way. Warren needs all the emotional security and the love which the world can offer him. He does love Mrs. Butler. He also was very close to the Perrys. I think it is important from every point of view that the relationship be continued as to Mrs. Butler." The chancellor's award of custody to the Perrys seems beyond question to have been based essentially on his belief that Warren's father might soon be paroled and that father and son must immediately be brought together. This was seemingly the over-riding consideration in his mind, with the economic factor a secondary influence. He said: "Now, in some way the son must make an adjustment to his father, even though this tragedy occurred. He cannot ignore his father. * * * As Dr. Carola Guttmacher points out, that adjustment will probably be easier in the home of the father's parents. It can be a gradual one instead of the sharp precipitation of an emotional climax which would probably otherwise result. * * * Taking all the facts together, all the indications, it seems to me that the best chance for Warren's happiness is to return him to Pittsburgh to the home and custody of Mr. and Mrs. Perry, with, however, every provision for visiting Mrs. Butler and for Mrs. Butler visiting him. The matter, of course, will remain under the jurisdiction of the Court. I shall ask that periodic reports be made to the Court as to what is happening in this situation on at least six months' intervals. These periodic reports, of course, will call for the cooperation of the Pittsburgh social agency."

As this Court, speaking through Judge Markell, said in the custody case of *Burns v. Bines,* 189 Md. 157: "We accept the lower court's findings of fact and its view of the evidence, but we are unable to concur in its conclusion." The proper custody for Warren does not turn here on credibility of witnesses or findings of fact. The facts are undis-

340

puted and plain. Under such circumstances we feel that we must exercise our best judgment in determining whether the conclusion the chancellor reached was the best one. *Donigan v. Donigan,* 208 Md. 511; *Walker v. Walker,* 209 Md. 428.

We feel that the best solution to the problem before us is to allow Warren to remain in the custody of Ruth Butler. It is far from clear to us that the chancellor was right in relying to such a great extent on the necessity of a speedy adjustment between Warren and his father. Dr. Guttmacher's conclusion that the best readjustment to the father would occur in the Perry home is based on the premise that the father will regain custody of little Warren. The premise is unsound legally and unlikely in fact to happen. The putative father is not entitled to custody. *Ramsay v. Thompson,* 71 Md. 315. It may well be, as the Probation Department suggested, that it would be best if Warren and his father did not come together, that he remain out of Warren's life indefinitely. For three years Warren lived with his maternal grandmother. He is well adjusted, happy, and loves and is loved. He does not want to go to Pittsburgh and has had nightmares when it appeared that he might have to. He is doing well in school. We find it significant and persuasive that the officials of the Probation Department, who work with questions of custody and adoption day in and day out, originally recommended that the child be allowed to remain in Baltimore with his grandmother. When the chancellor in a most commendable effort to reach the right answer had set in motion a re-examination of the conflicting claims in the light of the character, resources and intent of the Perrys, and the attention of the Probation Officer was directed to this, his view remained unchanged. Significant, too, is the reaction of Dr. Carola Guttmacher, the child psychologist, both on her original examination and on reconsideration. Her original opinion was that Warren should remain in the home in which he was living. When she was requested by the court to re-evaluate the problem, she reported in language which to us definitely shows misgivings as to the wisdom and soundness of sending the child to Pittsburgh. She speaks of "taking chances." She speaks of difficulties in-

herent in the situation, such as the age and weakness of Mr. Perry, and Warren's likely preference for Ruth Butler. It may well be that Mr. Perry really does not want his wife to have Warren. Mrs. Butler testified that when she was about to bring the child from Pittsburgh to Baltimore, Mr. Perry told her that he approved of this idea and offered to give her money to take the child to Baltimore because he did not want his wife to have Warren, although he denies making the statements attributed to him. Such a reaction is not improbable and Mrs. Butler's character and disposition, as revealed by the record, would seem to make it unlikely that she would have made this statement unless it were so. Although the sins of the children should not necessarily be visited upon the parents, there persistently arises the doubt as to Mrs. Perry's capacity to train a youth. Mrs. Perry brought up her son, Warren Scott, Jr. He turned out to be a brutal murderer and an adulterer. Whether a firmer, wiser mother could have done more to mould his character is, of course, speculative, but the results of her one upbringing cause misgivings as to the wisdom of confiding to her the training of another young life.

As the chancellor observed, the material advantages that apparently would be available in the Perry home, although important to be considered, are not decisive. Warren's present progress in school and the present availability of public education make it likely that he can be well educated if he remains in Baltimore. As Judge Parke observed for the Court in *Alston v. Thomas,* 161 Md. 617: "* * * an humble status and indigence are the honorable condition of many, and often the fruitful soil of virtue, discipline, and aspiration." Too often, prosperity is an evanescent thing and when the time for college comes perhaps there may be no money for it. Furthermore, the interest and affection which the Perrys say they have for Warren could be gratified by their contribution towards his education, and other advantages, if he remained in Baltimore. He should maintain contact with the Perrys—they should visit him and, if they accept the situation, later he should visit them.

It can be foreseen that if Warren were brought up in Pittsburgh, where the horrible murder of his mother occurred, he would be reminded of it far more often than he would be in Baltimore. The tendency of children to taunt other children is well known, and the case received wide publicity when the tragedy occurred. The Perrys suggested that if they obtained custody of Warren they would move from Pittsburgh. They did not say, however, where they would go, so the circumstances and conditions which might surround Warren if custody were given them, or even where he would be, cannot be known.

We are not unmindful that the conditions which make the present arrangements so satisfactory from the point of view of Warren's welfare and happiness may change. The case will be supervised regularly not only by the Probation Department but by the Department of Public Welfare, and the court will have complete control of the case at all times. If, however, the boy were sent to Pittsburgh, it might become difficult or impossible for the court to have effective control in the future. Custody orders are *res judicata* only as to matters and conditions existing at the time of the order and, in such cases, the extent of the protection afforded by the Full Faith and Credit clause of the Federal Constitution is highly doubtful. *New York ex rel. Halvey v. Halvey,* 330 U. S. 610, 91 L. Ed. 1133; *May v. Anderson,* 345 U. S. 528, 97 L. Ed. 1221. Of course, it is too elementary to be stressed that the welfare of the child is the controlling test in a custody case. *Burns v. Bines, supra; Stimis v. Stimis,* 186 Md. 489. We do not suggest for an instant that if the best interests of a child required it that the child should not be sent out of the State. In *Roussey v. Roussey,* 210 Md. 261, we directed that a boy be sent to join his brother in New Jersey. We merely say that in a close case, such as the case before us, one consideration is that the Court may exercise much more effective control when custody is kept in the State.

The matters we have discussed have led us to the conclusion that the best interests of Warren Scott, III, would be served

by keeping custody with his maternal grandmother, Ruth Butler.

*Decree reversed, with costs; and case remanded for passage of a decree in conformity with this opinion.*