FANNING *v.* WARFIELD

[No. 6, September Term, 1968.]

*Decided January 10, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*William B. Wolff, Jr.,* for appellant.

*Charles E. Hogg,* with whom was *Irving V. M. Abb* on the
brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The appeal is by a divorced and remarried mother, Mrs.
Philip Fanning, now a resident of Far Hills, New Jersey, from
a decree of the Circuit Court for Howard County passed by
Judge Sachse, (a) dismissing her petition for contempt against

her former husband, the father of their four children, for kidnapping their eldest son, (b) retaining permanent custody of the four children in the mother, (c) granting the father the right to send the eldest child, the son, to Gilman School in Baltimore, either as a day student or a five-day boarder, the boy to reside with his father, also remarried, in Howard County "from Sunday evening until his school-week is completed on Friday" if a day student, and also on two consecutive week-ends in every four-week period, and (d) fixing other periods of visitation.

The couple were married in 1947 and lived in Howard County until they separated voluntarily in 1964. In 1965 they executed a separation agreement, which provided in parts here pertinent:

> "A. That Husband agrees that wife shall have custody of the children on condition that Husband shall have free and full rights of visitation with said children at such times as will not interfere with the schooling and welfare of said children. Husband shall have the children visit with him for at least six weeks each summer and for at least half of the Christmas and Easter school holidays, exact times to be arranged between the parties by mutual agreement. The parties agree that either party shall have the right annually upon request to have this custody agreement reconsidered before their respective counsel or by the Court.

> "B. Husband agrees to pay (or be responsible) for the support of the children, Four Hundred Dollars ($400.00) per month and in addition one-half of the school tuition of said children beginning September, 1965, provided he shall be consulted as to the place or places of their schooling."

A supplement to the agreement, signed by both parties, provided:

> "that the parties confirm their understanding that the meaning of said sentence is that they agree that either party shall have the right annually upon request to have the visitation provisions of the custody agreement reconsidered before their respective counsel or

by the Court, and that they do not intend that the basic grant of custody to the wife shall be the subject of such reconsideration."

The agreement as clarified was ratified, confirmed and incorporated in the decree of divorce of January 21, 1966, which in addition specifically gave custody of the four children to the mother. Nevertheless in the Spring of 1966 the father sought to persuade the mother to send the son to live with him and go to Gilman School commencing in September 1966. The mother decided it would be better for the boy to continue his schooling at the Far Hills Country School and the father, apparently reluctantly, continued to pay half the tuition at Far Hills. Throughout the school year of 1966-67, the father not only maintained but intensified his pressure to bring about the boy's going to Gilman. The mother countered by saying that she would give consideration to any good full time boarding school selected by the father, suggesting five or six, all of which were comparable to Gilman.

In May 1967 the father filed a petition for modification of custody and visiting rights in order to gratify his increasing determination to have his son live with him and attend Gilman School.

A hearing on the petition was held in open court before Judge Mayfield in June 1967. When the testimony was concluded, Judge Mayfield at the close of the day said on the questions of custody and schooling:

"the basic problem is, what's the best interest and the best welfare of the children, the four children. Obviously, there's some lingering differences, resentments and bitterness between Mr. Warfield and Mrs. Fanning, which probably is understandable, but I haven't heard anything from the testimony that's been offered to indicate that any degree in change of custody is necessary, nor anything to indicate that the children are not being well-cared for, well-provided. I'm positively certain that both parents love the children equally, with the greatest amount of affection emanating from both parents, but, it would be extremely difficult for me,

certainly, and I would suspect, any Court, to say that one school or the other is better. I can understand Mr. Warfield's desire to have his son go to Gilman and I can understand Mrs. Fanning's reasons for wanting him to go to boarding school. Which would be the better in the long run I'm unable to say. I think it would be impossible for me to decree that the child attend one or the other schools. I think that from what Mrs. Fanning has testified, that by her indicated attention and desire, she is fulfilling the terms of the agreement with regard to schooling, when she says that she's satisfied that Ted will attend a boarding school either in Maryland or elsewhere, as long as it's a full-time, seven-day, boarding school. And, I have no reason to suspect that he wouldn't get an equal education at a good boarding school and equal to the education that he might receive at Gilman. And, that arrangement might also afford a better opportunity for both parents to visit without recrimination from either. So, I certainly wouldn't include in any decree, that I wrote, any directive, that Edwin attend one or the other schools.

\* \* \*

"As I say again, I've heard nothing to indicate that the, up to the present at least, that the best interests and the welfare of the children are not being met at the present time. Their schooling is, according to the testimony, in good shape. There's no indication that they are not in good health, well-clothed, well-housed, and they are certainly showered with love and affection. So, I wouldn't do anything to change the basic custody until perhaps that there's some indication that their best interests and welfare are not being served."

On the question of visitation, Judge Mayfield said:

"There seems to have been \* \* \* a fairly equal division of the children's time out of school between the two parents \* \* \*. But, I would hope that both parties would give consideration to the conveniences or incon-

veniences of the other and, also * * * to the desires of the children on some occasions * * *. There's a possibility that the summer visitation by the children might be extended * * *. I do appreciate the fact that Mrs. Fanning has to have the children back sometime, sufficiently ahead of the school year * * *.

"I'm hesitant * * * to spell out in any decree a fixed program of visitation. I've never known it to work even with the fullest degree of cooperation * * *. There's too many factors that enter into the picture including the children * * *. I'll hold it until I * * * hear from [counsel] that you cannot work it out * * * then I think I will."

After Judge Mayfield's decision, which was not implemented by either an order or a decree, the father intensified his efforts to accomplish his by now almost fanatically fixed determination to have his own way in the matter. Matters reached a climax when he abducted the boy and flew him to Howard County, after a prearrangement with the boy, who by being less than completely candid with his mother and stepfather stayed alone at home in the house in Far Hills, so that his father could come get him.

The hubbub that followed led the father to return the boy several days later and also led him to file a second petition for modification of custody on October 23, 1967. The mother filed an answer coupled with a petition to cite the father for contempt, and on November 8, 1967, Judge Sachse, imported from Anne Arundel County especially to hear the case, presided at a long day of testimony which included a private interview with the boy and on the following day heard arguments, after which he delivered a long oral opinion covering some twenty-seven printed pages of the record extract, which can be summarized as follows:

It is to be regretted that the parties have not yet stopped fighting with each other and the children have become infected with the antagonistic attitudes of their parents. Each party admits that the other is a good parent and loves the children. The boy wants to be with his father and because, if he goes to school in Bal-

timore he will be with his father, he wants to go to Gilman.

"The custody has been decided and I don't know of any reason to particularly change the custody of the boy * * * the boy seemed to be a pretty good little fellow, he's getting along well, looks healthy, he's intelligent, loves his mother, loves his father, and the custody has already been decided, and I don't know of any change in circumstances that justify the change of custody * * *. I have no reason to change the custody * * *. If we give the boy what he wants without changing custody I think we're accomplishing the purpose of the boy and that's what I'm interested in, accomplishing the purpose of the boy * * *."

The case, in our view, comes to this: the parties agreed that custody of the boy would be and remain in the mother, the divorce decree confirmed and ratified that agreement, Judge Mayfield found no reason to change custody or interfere with the usual normal prerogatives of the custodian and Judge Sachse found that there had been no change of circumstances or other reason to disturb custody. The record confirms beyond question that the mother is an excellent custodian, and that the boy in her custody leads a happy, well-adjusted, healthful, normal life. Yet, Judge Sachse in effect changed custody from the mother to the father solely because the father wanted that change and the boy, persuaded by his father's campaign to accomplish his desire, said he, the boy, wanted that change.

We think Judge Sachse's decision was unjustified on the facts and the law. It is true the cases say that the desire of an intelligent child who has reached the age of discretion should be given some consideration in determining custody. They go on to say, however: "But even in a custody case the wish is not controlling," *Radford v. Matczuk,* 223 Md. 483, 491.

The weight to be given the wish of a child in a custody case depends on the contribution the reasons for that wish make to the solution of the ultimate test, the best interests and welfare of the child. *Ross v. Pick,* 199 Md. 341. In the case before us, the child's wish made no real contribution to that solution. Rather, it would appear that the child's interests and welfare

would best be served by continuing custody in fact as well as theory in the mother and it well may be that the boy's character would be strengthened by his learning what his father apparently has not yet learned, that in this imperfect world one cannot have what he wants when he wants it, simply because he wants it.

The grant of custody of a child of divorced parents carries with it, in the absence of some extraordinary or highly unusual circumstances not here present, the right of the custodian to make decisions as to the child's education. 24 Am. Jur. 2d, *Divorce and Separation* § 796; 27B C.J.S. *Divorce* § 308; *Jenks v. Jenks* (Mo. Ct. App.), 385 S.W.2d 370; *Esteb v. Esteb* (Wash.), 244 Pac. 264; *Montandon v. Montandon* (Dist. Ct. App.), 52 Cal. Rptr. 43; *Lerner v. Superior Court* (Cal.), 242 P. 2d 321.

The provision in the separation agreement that the father be consulted as to the places of schooling of the children, being as it is in the paragraph dealing with the payment of tuition by the father, was we think intended to protect him against unreasonable educational financial drains, and not to entitle him to make a unilateral determination of the school to be attended.

The decree of Judge Sachse must, in our view, be reversed. The parties should make real efforts to agree on, arrange and execute periods, times and methods of visitation which will best serve the health and serenity of the children and minimize friction and discord. They can only do this if they subdue and minimize their personal and selfish interests and eliminate or subordinate efforts to achieve superior status in the eyes, minds and affections of the children.

If the parents cannot or do not voluntarily work out the questions of visitation in the spirit suggested, the courts, as Judge Mayfield indicated, will have to do, or try to do, it for them and the children.

The approach we suggest as to visitation problems should be used in considering the time and manner of the transfer of the son from Gilman if the mother elects to transfer him.

> *Decree reversed and case remanded for further proceedings, costs to be paid by appellee.*