# MARILYN JOY SULLIVAN *v.* JAKOB AUSLAENDER

[No. 532, September Term, 1970.]

*Decided May 3, 1971.*

2

The cause was argued before MORTON, ORTH and THOMPSON, JJ.

*Kurt Berlin,* with whom was *Frank Smith* on the brief, for appellant.

*Monroe J. Mizel* for appellee.

ORTH, J., delivered the opinion of the Court.

We are faced with the problem so often presented to courts of equity in domestic matters—what to do with minor children of a broken marriage. Difficult at best to come to a solution that seems satisfyingly wise and sound, the problem before us is intensified. The chancellor found each parent fit to be awarded custody [1] as "educated, intelligent people", concerned with the welfare of their son and daughter. He resolved the predicament by placing the care of the children in one and then the other. They are to spend three years in the custody of the father and the following three years in the custody of the mother. We must decide whether such disposition may properly stand in the light of the circumstances existent.

It was early enunciated, consistently followed, and recently affirmed that in the matter of custody the best interest and welfare of the child are determinative. See, for example, *Hall v. Triche,* 258 Md. 385, 386; *Goldschmiedt v. Goldschmiedt,* 258 Md. 22, 25; *Krebs v. Krebs,* 255 Md. 264, 266; *Fanning v. Warfield,* 252 Md. 18, 24; *Shanbarker v. Dalton,* 251 Md. 252, 257; *Heaver v. Bradley,* 244

---

1. He expressed it in the negative: "The evidence and exhibits are voluminous, but the Court does not find from the evidence that either parent is unfit."

Md. 233, 242; *Snow v. Watson,* 240 Md. 712, 713. "Of course, it is too elementary to be stressed that the welfare of the child is the controlling test in a custody case." *Butler v. Perry,* 210 Md. 332, 342, citing *Burns v. Bines,* 189 Md. 157 and *Stimis v. Stimis,* 186 Md. 489.[2] While it is pellucidly clear that proper custody is that which is best for the welfare, benefit and interest of the child, a question collateral thereto is the function of the appellate court in reviewing the custody award of the lower court. That is, must it consider the conclusion of the chancellor within the ambit of the clearly erroneous rule, Maryland Rule 1086,[3] or must it exercise its own sound judgment in determining whether the conclusion the chancellor reached was the best one.

Hammond, J., now Chief Judge, pointed out in *Butler v. Perry, supra,* at 340 and reiterated in *Melton v. Connolly,* 219 Md. 184, 188, that the determination of the proper custody for the child usually does not turn on credibility or findings of fact, and "Under such circumstances we feel we must exercise our best judgment in determining whether the conclusion the chancellor reached was the best one"—best, that is, for the welfare, benefit and interest of the child. This would apply, it is patent, when the facts are undisputed and plain. And it also would apply, we believe, when factual findings, required to be made, are made by the chancellor in such

---

2. That securing the welfare and promoting the best interest of the child is decisive is emphasized by the various other ways reference is made to that "clean and well defined" requirement. It was stated to be the "paramount question" in *Piotrowski v. State,* 179 Md. 377, 381; the "sole question" in *Young v. Weaver,* 185 Md. 328, 331; the "paramount consideration" in *Glick v. Glick,* 232 Md. 244, 248; the "determining factor" in *Heaver v. Bradley, supra,* at 242; the "ultimate test" in *Fanning v. Warfield, supra,* at 24; "of transcendent importance" in *Dietrich v. Anderson,* 185 Md. 103, 116.

3. Rule 1086 is applicable to this Court. It is the counterpart of Rule 886, formerly Rule 886 a (see amendment effective 12 October 1970) applicable to the Court of Appeals. Rule 886 was adopted effective 1 September 1941 as G.R.P.P. Part Three, III, Rule 9 c. Now applicable to review of criminal actions as well as actions at law and in equity, it followed the clearly erroneous rule which had prevailed at one time only in equity actions.

4

manner that he is not clearly erroneous. For we must accept the chancellor's factual findings and his view of the evidence if not clearly wrong, and, having so accepted them, we must exercise our best judgment, just as when the facts were undisputed, in determining whether the conclusion the chancellor reached on those facts was the best one. Thus the Court of Appeals said in the custody case of *Burns v. Bines, supra:* "We accept the lower court's findings of fact and its view of the evidence, but we are unable to concur in its conclusion." 189 Md. at 164. See *Ex Parte Frantum*, 214 Md. 100, 105. So while we recognize the importance of the opportunity by the chancellor to see and hear the witnesses in custody cases and the reluctance of the Court of Appeals and this Court to disturb his findings of fact, we are not bound by the strictures of the clearly erroneous rule, but rather exercise our best judgment, in determining that "ultimate" question of "transcendent" and "paramount" and "controlling" importance, whether the conclusion of the chancellor was the best one for the welfare, benefit, and interest of the child. See *Wilhelm v. Wilhelm*, 214 Md. 80, 84; *Trudeau v. Trudeau*, 204 Md. 214; *Cullotta v. Cullotta*, 193 Md. 374. And see *Winter v. Crowley*, 231 Md. 323, 329 where the application of the clearly erroneous rule in that custody case was to factual findings of the lower court that the father was a fit person to have custody of the children and the mother was not. We note that the Court's holding that the third and determinative finding of the chancellor that it was to the best interests of the children to remain in the custody of the father was "not to be disturbed on the evidence in the case." At 330. This holding was not within the clearly erroneous rule but implicitly an exercise of the Court's best judgment on the facts accepted. In *Fanning v. Warfield, supra,* the Court found the chancellor's decision as to custody "unjustified on the facts and the law." 252 Md. at 24. Again we think it was a clear exercise of the Court's independent judgment on the matter without regard to the

clearly erroneous rule. Cf. *Hall v. Triche, supra,* and *Goldschmiedt v. Goldschmiedt, supra.* In each of those cases the Court refers to Rule 886 a but does not cite either *Butler* or *Melton.* And in each, its finding was that the chancellor did not err rather than he was not clearly erroneous. Further in *Hall,* the Court said: "The matter [of custody] must be considered under Maryland Rule 886 a *and* our repeated references to the effect that the ultimate test in child custody cases is the best interest and welfare of the child." (emphasis supplied). 258 Md. at 386. We do not construe either *Hall* or *Goldschmiedt* as precluding us from exercising our best judgment as to the propriety of the conclusion of the chancellor with respect to custody as indicated by *Butler* and *Melton,* but rather merely refer the clearly erroneous rule to factual findings relevant to reaching that conclusion. We do not find *Hall* or *Goldschmiedt* necessarily inconsistent with our construction of our function.

There are two other rules to be considered by us here in exercising our best judgment whether the conclusion of the chancellor was the best one. The first is that the custody of children should not be disturbed unless there is some strong reason affecting the welfare of the children. *Krebs v. Krebs, supra.* "To justify a change in custody, the change in conditions upon which it is based must be one affecting the welfare of the child and not of the parent. * * * 'Custody should usually be changed only where the interest of the child requires modification where it appears advisable for the good of the child.' " (citations omitted). *Winter v. Crowley, supra,* at 331. See *Glick v. Glick, supra.* The other is that the desire of an intelligent child who has reached the age of discretion should be given some consideration in determining custody, although the wish is not controlling. *Radford v. Matczuk,* 223 Md. 483, 491. "The weight to be given the wish of a child in a custody case depends on the contribution the reasons for that wish make to the solution of the ultimate test, the best interests and welfare of the

child. *Ross v. Pick,* 199 Md. 341." *Fanning v. Warfield, supra,* at 24-25.

The trial of the action on review before us was had in the Circuit Court for Montgomery County sitting as a Court of Equity. The evidence adduced is below summarized.

Jakob Auslaender, appellee, at the time of the trial resided in Haifa, Israel, employed as an engineer performing work of a confidential nature for the Department of Defense of the government of Israel. Born in Graz, Austria in 1929 he fled with his family to what is now Israel in 1938. At the age of 16 he left school and worked on a kibbutz for one year when he joined the sea branch of an underground commando force, first as a sailing instructor and later running guns. By the time he was discharged in 1950 Israel had been formed and the underground force had become an army. He worked as a merchant seaman until the end of 1951 when he went to the United States and enrolled in a secondary preparatory school "for people like me who dropped out of school." He received the equivalent of a high school diploma in September 1952, was admitted to M.I.T. and was graduated from that institution in 1956. After serving as a research assistant at the Institute for a year he went to work for the United States Navy at the David Taylor Model Basin in the Washington area and remained three years. He was then employed by Hydronautics, Inc. in Laurel, Maryland as a research scientist. For this work he had a confidential and later a secret clearance. In 1965 he went to Israel for a year and his next employment was in the United States from 1966 to 1969 with Operations Research, Inc. in Silver Spring, Maryland with the title of Senior Staff and a security clearance of top secret. He had met Marilyn Joy Sullivan,[4] appellant, in the summer of 1953 in Detroit where he was working for the

---

4. Her name at the time of the trial, she having married Paul J. Sullivan 11 April 1969. Her maiden name was Koven.

summer. She came from "a Jewish home";[5] her father was a very well known member of the Jewish community in Detroit. They were married 6 June 1954 by a Jewish ceremonial wedding conducted by a Rabbi. Two children born of the marriage, Alan David on 27 October 1958 and Deborah Ruth on 10 March 1961, are the subject of these proceedings. The family went to Israel to settle in 1965 but returned to the United States in 1966. "I think our marriage was beginning not to work out and I, at least, felt that we were headed for divorce. I thought about that a lot and I knew that if we got a divorce in Israel, I knew that the laws there were such that I could keep the boy if I wanted to, and, in my opinion, children should stay with the mother, if things are as they should be, in her home. I also knew if we divorced there, she would be completely helpless there, so I thought we should go back to the States." He and his wife ceased living together immediately upon their return to this country in October 1966 and entered into a separation agreement on 27 October. It gave custody of the children to appellant, appellee to pay a total of 43% of his average net monthly salary as alimony to her and support for the children. An addendum was made to the agreement on 24 April 1967 to provide for child support payments in the event of the remarriage of appellant.

Appellee brought suit for divorce in the First Civil Court of the District of Bravos State of Chihuahua, Republic of Mexico, expressly submitting to the jurisdiction of the court. Appellant's attorney in fact answered the petition against her, "Confessing it in all its parts and submitting his constituent to the jurisdiction of this Court, praying for the resolution which is now granted." On 29 April 1967 the court decreed that the marriage was dissolved with all its legal consequences, that the two children will remain in the custody of the mother, and

5. Appellee explained: "Sometimes there were Sabbath candles in the house, and Friday night was an important occasion. I think every Jew knows when he is in a Jewish home."

that the separation agreement of 27 October 1966 was taken as confirmed, ratified and incorporated by reference into this judgment, "not being merged, but will survive same." The decree was declared an executed decree.

After the divorce the children lived with their mother in the house appellee had rented when they returned to the United States. "I saw them very often, there were no quarrels between me and their mother whatsoever. The children were adjusting, I thought, very well." In the summer of 1968 appellee noted that appellant was asking him to take the children more and more. "I didn't object to that, of course, I liked that, but I didn't think it was right. I wanted the kids to know that they had one address not two. I wanted them to know that there is a place where they live and a place where they visit * * *." He also felt that they were not being properly physically cared for. In the summer of 1969 appellant agreed that he would take the children to Israel for the summer "to stay partly with me and partly with their grandmother for the duration of the summer." He purchased round trip tickets for the children [6]—"I think the return trip ticket was the reservation for September 1st." He said the children left for Israel on 1 July accompanied by the two children of his then fiancee. He said his life had "really reached a crossroad and I was deliberating a lot, thinking a lot. There were a number of conflicting pulls in my life." He felt he was confronted by four problems:

> "First of all, I wanted to marry. Secondly, there was the problem of the children of my fiancee, who had stayed here for two years and had to go back to Israel. This was according to an

---

6. Appellee said that the children were citizens of the United States because they were born there and citizens of Israel because he was a citizen of Israel. "When they travel they have to leave the United States and enter it on an American passport and leave Israel on an Israeli passport, so I had to get them added to my Israeli passport." In order to do that the Israeli Embassy required appellant's agreement and she executed the necessary papers.

agreement between their mother and their
father.

"Third, I wanted to live in Israel. I really al-
ways had wanted to go back and all our life here
we were trying to do that one way or another.

"Sometimes it took a long time and later I was
myself trying to do that. The fourth problem
was that, of course, I couldn't keep my children
there without their mother's consent, and so
these things conflicted."

If he wanted to live in Israel he had to get a good job
there. "When I made that trip there with the kids, I
went to attend a scientific conference with the joint
science operation and the Operation Research Society of
America in Tel Aviv, and my idea was to look around for
a job. Those conferences are always places where you
look for jobs, and that would give me more days there,
so what happened was that I found that there was a tre-
mendous market." He received eight good job offers. He
decided to go back to the United States after the con-
ference and talk to appellant "and get her to agree to
let me keep the children with me for a few years." Leav-
ing the children with their grandmother in Israel he
returned to the United States and he saw appellant
briefly around 16 July. He decided he could not talk to
her then; "it wasn't the right circumstances." In the
meantime his plans "were rolling. I had accepted a job
and my fiancee had to quit hers, and we had to get roll-
ing, and so I, in this rolling I went to California, and
while I was there I was trying to contact her [appellant]
to find out if we would be in the same place at the same
time so we could talk." He learned that appellant had
showed up in Israel about the first of August. He went
back at once, arriving on 6 August, a Wednesday. Ap-
pellant had arrived in Israel on the preceding Saturday
night and the next day went to the day camp the chil-
dren were attending. She took the children and went to
the airport but did not have a passport for them. She

was unable to obtain one because the American Embassy was closed on Sunday. Appellant had informed the grandmother, appellee's mother, not to worry, that she had the children. But appellee's brother "didn't understand what was going on" and immediately obtained a court order to stop her from leaving the country.

Appellant explained how the circumstances leading to her going to Israel appeared to her. In January or February 1969 appellee asked her if he could take the children to Israel for a visit. "He was invited to give a paper and said that it will be a great trip for them, and, economically, he could take them with him, and that either he or I or Dr. Singer, who he intended to marry at that time, would go in August to bring the children back." They discussed it further. "[The children] were very excited. They had been there. They have relatives there, and, like most children, they like to take trips and look forward to something, so upon that, finally I decided to let them go." The latter part of May appellee called her and told her that he was going to destroy her passport which had the children on it because he took out a new passport for the children. She told him to return her passport. "[A]t that time I thought something was funny, so I started checking and I called his apartment and talked to the landlord. They told me Mr. Auslaender had given notice as of August 1st because he was moving to Israel. At that point I was in a dilemma as to what was happening, and checking a little further, had reason to believe that he was going to take the children and not bring them back." She confronted appellee with what she had learned about two weeks before the children were to leave, and appellee convinced her he was telling the truth. "He said that he gave that reason to his landlord because he and Dr. Singer were going to marry and he was going to move into that house, so the only way he could break the lease was by saying that he was moving to Israel, that in fact, he would never take the children away from their mother. He doesn't believe the chil-

dren should be without their mother, that I am a very good mother, that the children speak for themselves as to how they have been brought up, and in their training, and he wouldn't do such a thing, and it was all circumstantial, that he could understand why I was concerned on hearing this and not hearing it from him, so he convinced me that he was not lying, and I let the children go; in fact drove them to the airport with Dr. Singer and her children and put them on the plane to Israel." Appellee returned to the United States about 20 July. She called him at his apartment and he came to her office. "[W]e discussed the children. They were in camp and happy, having a good time. They were looking forward to coming home. They missed me, he told me." He told her he was thinking of changing jobs, that he had been offered a very good job at the David Taylor Model Basin, where he was employed when they first came to the Washington area in 1958 and he could not decide whether to accept that job or stay where he was. "[H]e made no mention of any intention of staying in Israel." On the contrary he told her that he planned to go "to San Francisco with Dr. Singer, that she was not going to Israel with him to get the children, that her husband had given her permission to leave her children in this country * * * and they were going to be married. It was going to be like a honeymoon, and from there he would go and get the four children and return them in time for school." On 29 July she called Dr. Singer's home to talk to appellee. She had received a postcard from her son wondering why he had not heard from her. She wanted to know why her son had not received her letters. "[A] strange man answered the phone, and identified himself as a furniture dealer, been picking up a few odds and ends to pack and ship to Israel. He told me that Dr. Singer and Mr. Auslaender had been there and left an hour before for the airport, for where he did not know. At that point I went over to the house. It was empty. * * * I went there and found all of Mr. Auslaender's

plans regarding reservations, a key to my house he had thrown away, and various other information. * * * I checked with the movers and found that he had, indeed, sent a shipment to Israel. It was to be leaving on August 3rd or 4th, and I immediately knew that he was not planning to bring those children back * * *." She concluded "that Mr. Auslaender had lied and deliberately deceived me to get those children over there, and he had no intentions of bringing them back." She flew to Israel to get them back. Her son did not understand why she was there. His father had told him he and his sister were staying in Israel, with permission of their mother, that she had agreed. When she went to the airport with the children she was told they could not leave, there was a "stop order." She was told at the American Embassy that nothing could be done until the Court decided the matter. They gave her a list of lawyers and she found one, Savir by name, who could speak some English and hired him. "I met with Mr. Savir and he told me he didn't feel there was any case, that I had a right to take those children out. It would be very costly. It could be very costly and time consuming, but he would try and see what he could do, and we started working on the facts." When appellee arrived in Israel "[h]e called me and told me that he was going to fight, if he had to keep me there for months, that he was keeping the children there, that I had no rights to those children, that he was glad I was in that country because he was going to take me through those courts and keep them at whatever cost and I had better be prepared to fight."

Appellee testified that he took steps to sue her in Israel. He brought action first in rabbinical court, for a jewish divorce and for custody of the children. That court found it had no jurisdiction; it appeared that appellant's mother was born a Christian and had never been of the Jewish faith. He sued her then in the district court, a civil court. She defended by claiming that court had no jurisdiction because "she was not an Israeli citizen and her domicile

was someplace else," and that the children's domicile was not Israel. The ruling of the district court was that it had no jurisdiction. He appealed that decision to the Supreme Court of Israel. The district court upheld the order restraining her from leaving the country until the appeal was determined. The case was argued before the Supreme Court. Before the decision was rendered, appellant and appellee started talking to each other at the urging and with the help of the court. They talked about three days and reached an agreement. It was reduced to writing with the assistance of counsel. The litigation had lasted three months; it started on 3 August and the agreement was executed on 27 October. No Israeli court had decided the case on the merits, that is what was best for the welfare and benefit of the children.

The agreement, announcing that disputes had arisen between appellant and appellee "in reference to the children" which they wished to settle "by way of mutual agreement and to put an end to all legal proceedings existing between them," provided:

"1. Both children, being now in Israel, will remain with the Father until the end of the school year of 1973 [approximately June, 1973] and the Father alone will be responsible for their maintenance. [This period will be referred to hereinafter as the first period.]

"2. During the first period the Mother may visit the children as frequently as she wishes and the Father agrees and undertakes to send the children to the Mother in the U.S.A. at his expense every summer during school vacation [as from June 1970]; provided that if the Mother will prefer to come to Israel during summer school vacation the Father undertakes to pay her traveling expenses by air.

"3. From the end of the school year of 1973 [June, 1973] to the end of the school year of 1976 [June, 1976] [hereinafter referred to as

the second period] the children will stay with their Mother in the U.S.A. and the Father undertakes to support the maintenance of the children to the best of his ability subject to the control of Foreign Exchange Regulations existing at that time.

"4. During the second period the Father may visit the children as frequently as he wishes and the Mother agrees and undertakes to let the children come to Israel and stay with the Father during summer school vacations but all expenses at such visits will be paid by the Father.

"5. By the end of the second period the boy, Alan David, who will then be almost 18 years old will decide his future as if he were adult and, in reference to the girl, Deborah Ruth, who will then be over 16 years of age, the parents will decide mutually about her future, taking her own free judgment into consideration as a major factor.

"6. The above stated arrangements concerning visits during summer vacations will apply respectively.

"7. If during the first period, because of war activities in Israel, foreign citizens residing in Israel are evacuated or requested to leave the country, the Father undertakes to make all necessary arrangements to send the children to their Mother in the U.S.A. for the period during which such an emergency exists.

"8. This agreement does not affect in any way whatsoever the rights of both parties as joint Guardians of their children; and the parties hereby agree that in case of death of either party while the children are still minor, the remaining party will become sole Guardian of the children and in case of death of both parties the Guardian or Guardians of the children

will be appointed by the respective executors of the estate of each party.

"9. The Father undertakes to reimburse the Mother as soon as possible for all the traveling, living and litigation expenses which she incurred between August 2, 1969, and October 29, 1969, concerning the disputes being settled by this agreement.

"10. The parties hereto agree and request that the Supreme Court in Jerusalem, State of Israel, enforce this agreement as a judgment binding both parties."

It was the judgment of the Supreme Court sitting as a High Court of Justice that the agreement be confirmed. It was received in evidence below over objection made on the ground that it was entered into by appellant under duress. She later testified: "I had no choice but to sign it. I was in the worst position. I couldn't afford to stay there any more. I had no more money. I didn't know anybody there. I couldn't even speak the language. I didn't know if I was being properly represented, but I was winning, and my children had been so emotional, and I just couldn't see taking them, staying there and putting them through any more, and I felt the only way I would get to see them is by signing this and hoping that we would get some settlement." Her lawyer had not been present when the agreement was executed. "He refused to come."

When school ended 19 June 1970 appellee "put them on a plane, with a round trip ticket, headed for their mother." They were to return to Israel on 16 August. On 10 August he telephoned them and was informed they were not coming back. About 13 August he received a special delivery letter from her lawyer stating that because of the unstable conditions in Israel the children were staying with their mother.

Appellant testified that she decided to try to keep the

children "because I feel children must and should be with their mother, that only a mother can care for children. The father—no one can be both mother and father to the children, and I feel the children—I want them to grow up in a free democratic country, away from tension and pressure of a country who is defending its very independence. I think we have the right as United States citizens to enjoy our schools here, which I believe are just as good, if not better, than the schools of other countries."

On 25 August appellee filed a petition in the Circuit Court for Montgomery County sitting as a Court of Equity, seeking to enforce the judgment of the Supreme Court of Israel and to obtain final custody of the children.[7] See Md. Code, Art. 16, § 66.

It was the conclusion of the chancellor that custody of the children should be awarded to appellee under the terms of the agreement of 27 October 1969. We accept the lower court's findings of fact and its view of the evidence, but we are unable to concur in its conclusion.

By its decree 3 September 1970 the lower court awarded the care and custody of Alan David Auslaender and Deborah Ruth Auslaender to Jakob Auslaender under the terms of the agreement of 27 October 1969, subject to the further order of the court. The 10 paragraphs of the agreement were set out verbatim in the decree. We find it clear, however, that the chancellor did not follow the agreement because he felt it was entitled to recognition in Maryland "under the full-faith-and-credit clause or *a fortiori* according to the comity of nations" as appellant suggests in her brief, or because he felt he was bound by its provisions since appellant and appellee had agreed to them, but rather because he found "that the continued best interest of the children would be served by

---

7. At the time of the hearing on the petition and answer appellee had married Dr. Singer. The mother of a girl 12 years of age and a boy 10 years of age, she was a physician, qualified as a pediatrician and a pathologist. She lectured in pathology at the Haifa Medical School.

again confirming the agreement." He repeated after setting out the terms of the agreement: "And this Court confirms and ratifies said agreement finding it would be in the best interest of the children * * *." [8]

We think it also clear that the determination of the custody of the children here does not turn on the credibility of the witnesses or findings of fact. We accept the chancellor's finding that both appellant and appellee are fit to be awarded custody. We observe that the voluntariness of the agreement is not material. Whether appellant freely executed it or accepted it under duress, appellant and appellee could not finally resolve the custody of their children to the exclusion of the determination of the chancellor in any event. It is not what the parents may have thought was best that is determinative but what is found to be best for the welfare, benefit and interest of the children as derived from the established facts. [9]

It is our best judgment that the children remain in the custody of their mother. We believe that the compromise solution of the chancellor does not give due regard for the welfare of the children and find no strong reason affecting the welfare of the children to depart from the custody award under the divorce decree with which appellee had at one time been content. We cannot conceive how it would be in the best interest of the children to take them from the mother, place them with the father in Israel for three years, then uproot them again and re-

---

8. However, the chancellor said that it was "most difficult" for him to determine:
"1) Whether or not the decree of judgment of the Supreme Court of Israel should be enforced, or
"2) Whether or not this Court should decide the matter solely on the basis of what is best for the interests of the children."
He said: "In considering these two questions, the Court is of the opinion that the first question must merge into the second question because ultimately the decision is who shall have the custody of the children."
9. Appellant and appellee do not claim that the lower court did did not have jurisdiction to determine the custody of the children. Compare *In the Matter of the Custody of Paul Eugene Karol, a minor*, 11 Md. App. 400.

turn them to the mother in the United States for three years, leaving their future at the end of the six year period to be later determined. We also feel that the circumstances here are appropriate in which to give some consideration to the wishes of the children. In its opinion the lower court noted: "The Court has conferred with the children in Chambers, out of the presence of the parties or their attorneys, both of whom have expressed a desire to remain with their mother. In the first interview with the children, the oldest child, Alan, expressed a desire to remain with his mother in the United States, but the girl Deborah, age 9, had no preference. The second interview the Court had with the children was approximately five days after the first interview. At the second interview, Deborah, the youngest child, also expressed a desire to remain with her mother." There was also evidence that while appellant was in Israel appellee took the children out to dinner several times and then asked if he could take them to a Bar Mitzvah for a relative's boy. She allowed him to take the children. He called her at 12:30 A.M. and told her that he had the children in Haifa and was not bringing them back to Tel Aviv, and that she could see them only when he was present. She went to see them the next day "with him sitting right there breathing down my neck." When she got back to Tel Aviv, he called her and said Alan was missing and asked if she had given the boy money to run away. She replied, "You know better than that because you didn't leave me alone, and I wouldn't do such a thing." While she was talking to appellee, there was a knock on the door. It was Alan. He had run away to be with his mother, taking money from his sister's purse. He was very upset, saying, "Mommy, I told you if he ever did this again, I would run away from him."

There is another consideration. Custody orders are *res judicata* only as to matters and conditions existing at the time of the order. If the children were sent to Israel it might become difficult or impossible for the lower court

to have effective control in the future. We do not suggest for an instant that if the best interests of the children required it that they should not be sent to Israel in the care of their father. "We merely say that in a close case, such as the case before us, one consideration is that the Court may exercise much more effective control when custody is kept in the State." *Butler v. Perry, supra,* at 342.

We are led to the conclusion that the best interests of Alan David Auslaender and Deborah Ruth Auslaender would be served by keeping custody with their mother, the appellant, as provided in the divorce decree of 29 April 1967 and agreement of 27 October 1966, with support of the children by their father, the appellee, as provided in the addendum to said agreement of 24 April 1967.[10]

> *Decree reversed, with costs; and case remanded for passage of a decree in conformity with this opinion.*

---

10. The addendum reads:

"It is further agreed between the parties hereto that in the event the wife remarries while the children are still minors Paragraph 3 of this agreement shall become void but the husband, instead, will pay to the wife as support for the minor children the sum of $300.00 per month and in the event the husband's salary changes that sum will be adjusted accordingly. Said payments are to continue until either minor child attains the age of twenty-one years, marries, enters military service or is otherwise emancipated, at which time the said support will be reduced fifty percent (50%) for the first child to be so emancipated, and the payments to cease completely upon the emancipation of the second child.

"It is further agreed between the parties hereto that commensurate with his ability the husband shall assume the financial responsibility for the future (college, university) education of each child even if the child attains the age of twenty-one years, marries, enters into military service or is otherwise emancipated and the wife is no longer receiving payments as child support for the children.

"It is further agreed between the parties hereto that the husband shall carry medical insurance for the children and in the event there are unusual medical expenses that are not covered by said insurance, the husband shall contribute at least half of said expenses.

"It is further agreed between the parties hereto that the husband shall share unusual dental expenses."