EUGENE PRATT COOKE, JR. *v.* KATHLEEN
BRADIGAN COOKE

[No. 757, September Term, 1973.]

*Decided May 24, 1974.*

The cause was argued before MOYLAN, GILBERT and LOWE,
JJ.

*Norman F. Summers,* with whom was *Julian S. Brewer,
Jr.,* on the brief, for appellant.

Submitted on brief by *William G. Kolodner* for appellee.

LOWE, J., delivered the opinion of the Court.

Eugene Pratt Cooke, III, born April 28, 1970, was the subject of the custody proceeding from which his father, Eugene Pratt Cooke, Jr., now appeals. The marriage of Mr. Cooke and Kathleen Bradigan Cooke survived its first four years somewhat less than blissfully, but eventually it resulted in separate abodes for Eugene III's parents. At the time this custody proceeding was tried in the Circuit Court for Baltimore County, each lived with his or her respective parents.

The separation took place on July 27, 1972. The child commenced its unsettled and unsettling existence with its mother, at the home of her parents. Four days later, Appellant volunteered to take his estranged wife to work and to "baby sit" with his son. During the sojourn to her place of employment, an argument ensued and she got out of the automobile and was left on the roadside by Mr. Cooke who then drove off with the child.

Appellee telephoned her husband as soon as she arrived home. He refused to return the child unless she agreed to return to live with him. Faced with this dilemma, Appellee filed a petition for custody on August 11, 1972. She was awarded temporary custody by *ex parte* order signed the next day by Judge Lester L. Barrett. When an attempt was made to execute the order neither husband nor child could be found. Appellant had secluded the child at a Holiday Inn in Catonsville.

On August 18, 1972, the husband filed an answer and cross-petition for custody. Judge John E. Raine secured an immediate investigation of the paternal grandparents' home by the Probation Department and subsequently signed an order, dated August 24, 1972, countermanding Judge Barrett's order, and granting temporary custody to the father.

In her answer to the cross-petition on September 5, 1972, Appellee prayed rights of visitation which had been denied

her to that date. Designated visitation dates were prescribed upon hearing before a master a month later.

Following a full hearing in open court on February 22 and 23 of 1973, Judge Walter M. Jenifer awarded custody to the mother by written opinion and decree dated July 25, 1973. On appeal Appellant attacks the Chancellor's decision and the reasons he set forth in his six page opinion.

The opinion stated that the Chancellor relied upon two principles "which should guide any court in custody cases . . . ."

> "The paramount consideration is to determine what course would subserve the best interests and welfare of the child involved. *The other* long-settled *principle* of law which must be given consideration *is the preference to be afforded the natural mother* where a young and immature child is before the court." (Emphasis added.)

Quoting from *Hild v. Hild,* 221 Md. 349, and at length from *Kirstukas v. Kirstukas,* 14 Md. App. 190, the Chancellor articulated the process he had used to arrive at his decision and the reasons supporting it.

> "This Court is of the opinion that when the above principles are placed upon the balance scales, said scales are tilted in favor of the natural mother."

He concluded by analogizing the instant case to *Pitts v. Pitts,* 181 Md. 182, and quoted from page 193:

> " . . . To deprive this infant child of the society, companionship and the instinctive and natural maternal love of her mother, a young woman who, at the time of the passage of the order appealed from, was capable of taking care of and rearing the infant in a home where it would be provided with all the necessities of life, would hardly be to the interests of that child. The mother-in-law, Mrs. Pitts, spoke of the appellee, when in good health, as the loveliest, the quietest and the gentlest girl she ever knew, that she was perfectly lovely always. At

the home of Mr. and Mrs. Tilghman G. Pitts, Sr., the infant received adequate care and attention by a nurse. However, the association of the child with its young mother in suitable surroundings is of primary importance in the case now before us."

Although a thorough review of the record brings us to the same conclusion, we cannot stand mute when faced with the wrongful application of the "second principle" or maternal preference. Before discussing that principle we hasten to note that we are not compelled to do so *vis a vis* the Maryland "Equal Rights Amendment" (E R A)[1] since Appellant neither raised nor argued it. It would be misleading for us to write, however, without acknowledging that we do so in its shadow.

Any possibility of a denial of equal rights properly gives us especial pause since "equality" is the very foundation of this society. The term itself has a ring, as do ritualistic incantations, and well it should, for it occupies a most exalted position in a democracy's scale of values. The awe it inspires should not, however, cause us to forget that the "self-evident truth" of equality of creation of all persons was not meant to describe human congenital endowments,[2] but rather their political and legal rights.

Suffice to say that if the presumption of "maternal preference" is utilized within the restrictions articulated in the cases espousing it, a proper application neither denies nor abridges the equality of rights of either party. The

---

1. An acronym for Art. 46 of the Declaration of Rights of the Maryland Constitution and the proposed Twenty-seventh Amendment to the Constitution of the United States. Art. 46, which became effective December 5, 1972, states that "Equality of rights under the law shall not be abridged or denied because of sex." The proposed federal amendment, ratified by thirty-three of the required thirty-eight states, reads in part, "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex."

2. As George Orwell said "All animals are equal but some animals are more equal than others." Animal Farm, Ch. 10. In spite of Md. Code, Art. 72A, § 1 which provides that both parents have "equal powers and duties" toward their minor children and that "neither parent has any right superior to the right of the other concerning . . . custody," it would seem that such was the state of equality in custody controversies between fathers and mothers ante E.R.A.

"rights" of the parents are not the issue.[3] They have been overridden by the singular interests of the child which the parents in turn have submerged by their own acts, in a ratio directly proportional to their responsibility for the family's division. The child's best interest, the "cardinal principle" and the "paramount consideration" as described by the Chancellor, is not a "principle to be placed upon the balance scales" but rather is the measure by which all else is to be decided. No factor will be given weight that is not homogeneous with that "cardinal principle."

In *Kirstukas, supra,* 196, Judge Moylan distilled from the appropriate cases a single limitation placed upon the application of the maternal preference. "Every statement of the preference is hedged about by the context 'all else being equal.' " The presumption is obviously intended to serve the limited function of a "tie-breaker." However, some courts seem inclined to repeat it as an easy answer. Relying upon the compelling language of the cases discussing that "visceral bond ... and primordial tie," these courts have come to weigh it first and most heavily on the custodial scales.

We concede that it is unlikely that litigants will have parental qualities so equally balanced that resort to the maternal preference will be necessary. It should therefore not be expressed as a consideration at all, except in those limited instances where it would be impossible to decide upon the evidentiary facts.

In the main, the job of judging is to determine the problems of individuals. Individual circumstances should and do alter cases and our system comprehends the dignity of individuals. Such results do not obtain by applying categorical formulae to similar factual circumstances *before*

---

3. Judge Marshall A. Levin of the Supreme Bench of Baltimore City in his unpublished treatise, "Guardian Ad Litem in a Family Court?," discusses the injury done children by the venomous attacks of the gladiators bent primarily upon putting asunder that which "God hath joined together." "The very real interest of the child may, then, be submerged in the bitter battle between his parents conducted under the traditional rules of the adversary system — a system admirably suited to ascertaining truth in a two sided controversy where credibility may be the main issue."

weighing each evidentiary matter, grain by grain. If, however, after that grueling process, the scale is still in a state of equipoise, only then should we look to the applicable formula to alter the balance. The appealing procedure of applying formulae as ready answers atrophies the judicial process, which is, of necessity, a sometimes tedious preoccupation with detail.

In nearly every case, as in the case at bar, the result will be the same without resort to the crutch of a presumptive preference. Had his opinion not so expressedly assigned the preference as his reason, the Chancellor's review of the evidence contained ample justification for the result he reached. He found the appellant "unpredictable, highly volatile and impulsive . . . His periods of employment have been sporadic and shortlived. At the time of the hearing, he attempted to deceive the Court . . . . His act in secluding his child . . . was ill advised and detrimental to a two-year-old baby. His association with . . . [another girl] was suspect . . . . On the other hand, the natural mother was the stabling [sic] influence and the main financial support of the husband and child during their married life together. There was nothing adduced in the evidence to indicate that she was an unfit mother, and the husband's parents conceded that she conducted herself as a good and proper parent. She is now making her home with her parents, Mr. and Mrs. James Bradigan which, according to Mrs. McMahon, the Probation Officer, has adequate accommodations for the mother and child, and her parents have expressed their willingness to have them as a part of their household." It is clear that the Chancellor carefully weighed all of the evidence and properly balanced the attributes of each parent against those of the other. Since we are not confined in custody cases to the "clearly erroneous" limitations of Md. Rule 1086, we have reviewed the entire case and analyzed the propriety of the Chancellor's findings. *Sullivan v. Auslaender*, 12 Md. App. 1. The result was properly reached by the Chancellor when he summarized the evidence. Unfortunately he did not so express it. Instead he used the favored parent presumption as his rationale.

At times there may be a temptation to explain a decision to litigants or lay persons by the use of an apothegm, a maxim or a legal presumption. The explanation is not only easier for the court to make, but is frequently more acceptable to a losing party than is the acknowledgment that his own shortcomings caused him to lose his offspring. The seeming coldness of objectivity in "raveling out [one's] weaved-up folly" [4] is but one consequence of our belated constitutional preoccupation with equality. What we have preached with serenity in the past, we are called upon to practice with sincerity presently.

A tangential factor of some concern confronts us. To thwart the initial order awarding temporary custody to his wife, Appellant avoided service of the order and secluded the child from August 12, 1972 until August 17, 1972. Presumably unaware of Appellant's action, Judge Raine countermanded the initial order and awarded temporary custody to him. The testimony reflects accusations, which Appellant denied, that he threatened to remove the child to Canada in the event he lost custody below. The record also reveals that a petition for contempt was filed on July 31, 1973 stating that Appellant refused to surrender custody. Appellant's counsel, responding to our inquiry during oral argument, advised us that he knew not the whereabouts of Appellant or the child. We are constrained therefore to issue our mandate forthwith.

> *Judgment affirmed; costs to be paid by appellant; mandate to issue forthwith.*

---

4. The quote continues, "If thy offenses were upon record, would it not shame thee in so fair a troop to read a lecture of them?," from the Deposition Scene of King Richard II, Act IV, i. 192-243, Wm. Shakespeare.