ISADOR F. KARTMAN *v.* JACOB KARTMAN ET AL.
[No. 56, April Term, 1932.]

*Decided June 22nd, 1932.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*William Cabell Bruce* and *H. Mortimer Kremer,* for the appellant.

*Herbert Levy,* for the appellees.

SLOAN, J., delivered the opinion of the Court.

This is a struggle between two brothers for the possession of the seven year old son of one of them, and, like all such cases, no matter how decided, it leaves a scar which even time may not obliterate.

Two brothers, Isador Kartman, the appellant, and Jacob Kartman, appellee, married sisters. They resided in the same house, a duplex dwelling. Isador and his wife, with one son, occupied the ground floor apartment; Jacob and his wife, childless, the upper floor. When the boy in this case, Donald, was three weeks old, his mother died. For a few weeks after Isador's wife died, he and his six year old son, Robert, and the infant lived upstairs with the appellees; the care of the baby devolving on his aunt, Mrs. Jacob Kartman. The appellant then had his mother and father come to live with him and the son, Robert, in the lower apartment, where they remained for two years. The four then moved to a house nearby on Liberty Heights Avenue, where they lived

together until August, 1929, when the father died. In that month the appellant married, and he, his wife, and son Robert, moved to Mount Washington. In the meantime the younger child has been with his uncle and aunt, the appellees, but has been on an average two days a week with his father, returning to the appellees at night, except on three occasions, on one of which it was manifest that the appellant did not intend to take him back.

The upshot of it all was that on July 30th, 1931, Isador Kartman filed a bill against his brother Jacob Kartman and his wife, Erma, charging that the appellees were arbitrarily and unlawfully withholding in their custody the seven year old son of the appellant, and prayed a decree that the appellant be awarded his son.

The bill is filed under the provisions of section 80, article 16, of the Code, which gives the equity courts of this state original jurisdiction in all cases relating to the custody or guardianship of children, but by that section it is provided that nothing therein "contained shall be construed to take away or impair the jurisdiction of the several juvenile courts in this state and of the Juvenile Court of Baltimore City in cases relating to dependent or delinquent children, or be taken or construed to repeal or modify the provisions of Section 21 of Article 42 of the Code of Public General Laws." These cases more often come before the courts on petitions for habeas corpus than on petitions or bills in equity, but, no matter how they come, the principles to be applied, the status of the parties, and the thing to be done are the same, and for this reason, and because of the intention of the Legislature in the enactment of section 80 of article 16 (Acts of 1920, ch. 573), not to impair the effect or modify the provisions of section 21 of article 42 (Acts of 1890, ch. 70), it is in order here to quote from the latter act as follows: "Whenever a minor is brought before a court or judge upon habeas corpus in private custody, the court or judge, in the determination of the case, shall be guided and controlled by a parental consideration of what is demanded by the best interests of such minor, and the custody shall be determined

without regard to technicalities of procedure and without reference to any alleged technical claim or right of custody; the minor, when brought up by habeas corpus, shall be deemed to be in the custody of and subject to the order of the court or judge issuing the writ or hearing the case, and the court or judge may adjourn the examination from time to time, and shall not allow the proceedings to be controlled by the parties thereto, or any of them, and it shall not lie within the power of the parties, or any of them, to dismiss the case or settle it; * * * and any court or judge disposing of the custody of a minor upon habeas corpus may assume and retain jurisdiction over such minor in as ample a manner as a court of chancery, or judge of a court of chancery upon bill or petition, and may pass such other and further orders in relation to his care and custody as may be deemed just and beneficial." But after all the acts referred to are merely declaratory of the powers theretofore exercised by courts of chancery where the disposition of children was concerned. *Barnard v. Godfrey,* 157 Md. 264, 145 A. 614. As expressed by Justice Brewer, then on the Supreme Court of Kansas, in the case of *Petition of Frank B. Bort,* 25 Kan. 308: "When the custody of children is the question, * * * the best interest of the children is the paramount fact. Rights of father and mother sink into insignificance before that. Even when father and mother are living together, a court has the power, if the best interests of the child require it, to take it away from both parents, and commit the custody to a third person. In other words, a court of chancery stands as a guardian of all children, and may interfere at any time and in any way to protect and advance their welfare and interests." See *Schneider v. Hasson,* 161 Md. 547, 157 A. 739, 741.

In their brief, and at the argument, the appellees stressed an agreement or understanding between the brothers almost immediately after the mother's death, and alleged declarations of the father afterwards, as in the nature of an estoppel to his right to take these proceedings, and cited several authorities to the effect that such agreements should be re-

spected, but, as stated in *Re Rosenthal,* 103 Pa. Super. Ct. 27, 157 A. 342, 344: "The relationship of parent and child is a status—not a property right. * * * The paramount issue— whether the jurisdiction of the court of the county in which the child happens to be at the time (*Finlay v. Finlay,* 240 N. Y. 429, 148 N. E. 624, and *Commonwealth v. Daven* [298 Pa. 416, 148 A. 524], *supra*) is invoked in habeas corpus proceedings, by petition, or by bill, or in any other way—is the best interest and permanent welfare of the child. The contract is not conclusive, but must yield to this consideration." This is also the rule declared in this state by the statute quoted (article 42, section 21), wherein it is stated that the court "shall be guided and controlled by a parental consideration of what is demanded by the best interests of such minor, and the custody shall be determined without regard to technicalities of procedure and without reference to any alleged technical claim or right of custody."

As was said in the opinion by Judge Digges in *Barnard v. Godfrey,* 157 Md. 264, 267, 145 A. 614, 616, "There can be no binding, and very little helpful, precedent found in the decisions of the courts on this subject, because essentially each case must depend upon its peculiar circumstances," but courts are bound, in determining the fate of children, and in fixing the environment which is thereafter to direct the course of their lives, to recognize the natural right of parents to the custody of their children, and unless convinced that it would be injurious to their welfare, to maintain the relationship which society has always recognized as the one most to be desired. Ordinarily the court or judge who has had the parties before him, has the best opportunity to observe their temper, temperament and demeanor, and so decide what would be for the child's best interest, and unless there is some sound reason to the contrary his findings ought not to be disturbed. The conclusion at which this court has arrived is at variance with that of the chancellor, and our reasons should therefore be set out.

It is agreed that both brothers are willing and able to properly support the boy in this case, and that in the home

of his uncle and aunt he would not only be amply provided for, but that there would probably be as much affection displayed as if he had been their natural child. On the other hand, the father has never shown any lack of interest in or want of affection for the boy.

This relationship started from force of circumstances when the mother died leaving a three weeks' old baby. All the parties lived under the same roof, in separate apartments, in a building owned by the brothers in common. For about two years after the death of Isador's wife, he, with his son Robert, who is about five years older than Donald, and his father and mother, occupied the apartment in which Isador and his wife had lived; the baby being cared for by the appellees, both blood relatives of the child. The reason given by the appellant for leaving the child with the uncle and aunt, instead of the grandmother, is that the latter was not in good health, and not able to care for it. So long as the parties lived in the same house the arrangement was perfectly natural and logical. The appellees contend that it was all done by agreement, and for this they, rely on statements ascribed to the appellant that he would never take the boy away from them. It was only about a month after the death of Mrs. Isador Kartman that Jacob very tactlessly suggested to Isador that he be allowed to adopt the boy, a suggestion which Isador says he promptly refused, and resented. Jacob's version is that the brother did not fly into a rage, but said he wanted six months to think it over, but that he could rest assured he would never take the boy away from him. A few months after the appellant moved to Liberty Heights Avenue, he demanded the custody of the boy, and after an all night session at the home of the wife's brother, he consulted Mr. Julius Wyman of the Baltimore Bar, who got the brothers together in his office, and then advised Jacob to give up the boy. Isador's version of the conference is that Jacob said: "If my brother wants his boy he will have to go to court. That is the same answer I got on all these occasions." Jacob's: "I told Mr. Wyman that I differed with him as to my rights, both moral and legal, and that I would not give

the boy up. * * * The thing continued in discussion for a month or two, I should say. We had a meeting at the brother-in-law's house, we had a number of other discussions, but the thing just petered out, quieted down. Then he resumed his visits to the house, calling for the boy to see him, and nothing more was done about his demanding the custody."

It is evident from the facts mentioned that Jacob made up his mind in the beginning to have the boy permanently, and the wife's relations made it their business to see that it was done, and every time Isador declared himself, the same relations got together and talked him out of it. The wife's father and mother live with the appellees, and they have not been inactive in the endeavors of the appellees to keep the boy where he is.

There is another factor in the relations of the brothers with reference to the boy which ought to have convinced the appellees that the appellant had no intention of surrendering the boy. Jacob declined any offers of assistance from Isador. When Isador left the Dorchester Street house in which both resided, he sold his interest to Jacob, taking on account a mortgage for $5,300, with interest stipulated at eight per cent. There was no sentiment in that deal. Jacob paid the stipulated interest by check as it came due, but none of the checks were ever deposited by Isador. They did not discuss it, but there is enough in evidence to show that Isador intended it to be compensation to Jacob for the expenses of the boy. Isador is also maintaining for both of his boys an insurance trust of $85,000 at the Safe Deposit & Trust Company of Baltimore, so that he does not appear to have discriminated for or against either of the boys, notwithstanding the divided custody.

In August, 1929, Isador married, and his wife does not appear to have been cordially received by the appellees, and now the relations between the two households are definitely strained. There is no word in the evidence that she is not competent, intelligent, and respectable; but she did not make as favorable an impression on the chancellor as did Mrs.

Jacob Kartman. By profession she is an anesthetist, not regularly engaged, but taking special or occasional employment. There is no evidence that she neglects her household duties or the family into which she married; the son, Robert, who is twelve years old, old enough to know and young enough to be frank, testified that she treated him all right.

Other things being equal, and they seem to be, there is another consideration, sufficient to decide this case, and that is, not one boy only, but two. With relations between the principals strained as they are, we have these boys separated and, if the appellees have their way, to be brought up in hostile camps. They would thus be made the victims of a situation not of their making. Assuming that there will be just as much affection exhibited toward the younger boy in one house as in the other, it will be far better for both boys that they be brought up together in the years when genuine companionship has its only chance to be made. If there is one thing that a boy needs in a house it is another boy.

For the reasons stated, we feel constrained to differ with the conclusion reached by the learned chancellor in this case.

Cases of this character generally leave more of bitterness than any other kind that comes to court, and no matter who wins, they both lose. Isador gets his boy, but when he does, he should not forget that he is under everlasting obligations to Jacob and his wife for having come to his rescue in his hour of need, but at the same time they should recognize the parental rights of Isador. If they face the situation as men should, and the women help, as they should, they will speedily adjust themselves to the changed condition. Otherwise the damage done will be irreparable.

> *Decree reversed, and case remanded for a decree in accordance with this opinion; each side to pay half the costs.*