JOHN FRANKLIN DAVIS, JR. *v.*
MARY LOUISE DAVIS

[No. 110, September Term, 1976.]

*Decided October 8, 1976.*

The cause was argued before THOMPSON, POWERS and MELVIN, JJ.

*John R. Foley* for appellant.

*A. J. D. Schmidt*, with whom was *Judson R. Wood* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

This case involves the custody of Katherine Leigh Davis, (Leigh), born March 21, 1968, the youngest child of John Franklin Davis, Jr., the appellant, and Mary Louise Davis, the appellee. On September 25, 1974, Mr. Davis filed a suit in the Circuit Court for Montgomery County for a divorce *a vinculo matrimonii* on the grounds of adultery and asked for custody of the three minor children of the parties. In her answer and in a cross-bill the appellee sought custody of the three children. The chancellor awarded Mr. Davis a divorce as requested, gave him custody of the two older children of the parties and dismissed the appellee's cross-bill. Mrs. Davis was given custody of Leigh. Mr. Davis has appealed; Mrs. Davis did not; thus, the only question before the Court is the custody of Leigh.[1]

The parties were married on September 26, 1958, and lived in Montgomery County, Maryland, until the date of trial,

1. In view of our decision we will not need to treat a second question raised by Mr. Davis.

December 11, 1975. Three children were born to the parties: John Franklin Davis, III, now age 17, Mary Jane Davis, now age 15, and Leigh, now age 8. While their marriage appears to have been anything but harmonious, at least during the last year, the parties lived together until they separated on January 31, 1974. During this period Mr. Davis complained to his wife as to the amount of her drinking and her occasionally returning home in the early hours of the morning. On January 31, 1974, the appellee, Mary Louise Davis, left the family home and took an apartment. Her youngest daughter accompanied her but apparently the two older children declined to do so. There was evidence that after the separation and prior to the trial Mrs. Davis held a number of different jobs but always, was careful to arrange that her daughter was properly cared for by neighbors or other baby sitters, including in some instances her older children. The older children visited her with some frequency and the youngest daughter spent Friday nights and Saturdays with Mr. Davis. The relationship of each parent will all the children was described as good. The relationship between the children also appears to be good. Mr. Davis has made arrangements for a neighbor and his older children to take care of Leigh from the time she returns from school until he returns from work, in the event he should be awarded custody. Mr. Davis lives in a nice four-bedroom dwelling. Mrs. Davis lives in a nice two-bedroom apartment.

There was strong evidence that Mrs. Davis had committed adultery with three different men on many occasions from June of 1974 until November 30, 1974, more than two months after the bill of complaint had been filed in these proceedings. Specifically the following situations were observed:

1) Prior to June, 1974, Mrs. Davis was observed in the company of William Katzenberger numerous times including several at the New Yorker Restaurant in Laurel;

2) On June 26, 1974, Mrs. Davis was observed entering Katzenberger's apartment building at 4:45 p.m. from which they exited at 6:08 p.m.

3) On June 27, 1974, Mrs. Davis was observed "hugging and kissing" Ray Giovannoni in the latter's automobile parked outside of the Side Door Restaurant in Gaithersburg;

4) On July 2, 1974, at approximately 6:00 p.m. Mrs. Davis was observed kissing Katzenberger in a service station;

5) On July 3, 1974, Mrs. Davis was observed entering her apartment at approximately 12:46 p.m. from which she exited at 1:31 p.m. followed by Katzenberger at 1:36 p.m.;

6) On July 18, 1974, Mrs. Davis and Giovannoni were observed leaving the Side Door Restaurant shortly after midnight, entering the latter's automobile, driving to a dark area in the rear of the parking lot where they parked for 10 minutes before returning to the bar;

7) On July 24, 1974, Mrs. Davis and Giovannoni were observed entering Giovannoni's apartment building at 11:50 p.m., the lights went off at 1:05 a.m., and Mrs. Davis left the building at 6:45 a.m.;

8) On September 1, 1974, Mrs. Davis and Giovannoni were observed in the latter's apartment at midnight preparing for a party which was still going on at 3:30 a.m.;

9) On September 4, 1974, Mrs. Davis was observed leaving the Washington Country Club at 8:25 p.m., arm in arm with Dale Thompson, embracing and kissing passionately after which they went to Thompson's home in Colesville where they stayed until 12:35 a.m.;

10) On September 9, 1974, Mrs. Davis arrived at Thompson's home at midnight, Thompson arrived at 1:30 a.m., at 2:30 a.m. the lights on the first floor went out and the lights on the second floor went on, at 3:00 a.m. all lights

went out until Mrs. Davis left the home at 4:30 a.m.;

11) On October 26, 1974, Mrs. Davis and Giovannoni arrived at the latter's apartment at 2:00 a.m. and at 9:30 a.m. Mrs. Davis left;

12) On November 30, 1974, Mrs. Davis and Giovannoni arrived at his apartment at 2:30 a.m. and at 9:30 a.m. Mrs. Davis left.

While there is no evidence that the appellee committed adultery at a location where Leigh was present, there was evidence that on occasions Mrs. Davis has taken her daughter out in the company of at least two of these men. Mrs. Davis did not in the testimony, either at the custody hearing nor at the earlier trial, discuss her adulterous relationships in any manner. The chancellor with reference to the adulteries made no detailed findings of fact but stated that the "evidence certainly was overwhelming in connection with her adultery." The court found that Mr. Davis provided a more than adequate home for the two older children and that they seemed to be doing well with him. He found that Mrs. Davis had been providing an adequate home for the youngest child, Leigh. Stating that he was aware of the presumptions of unfitness that arise from adulteries, the chancellor felt that the best interest of the child was continuing the present situation rather than changing custody. The chancellor did not spell specific visitation rights but gave each party to the proceedings the reasonable rights of visitation with the children because the parties had themselves worked out these rights in a satisfactory manner.

Inasmuch as the chancellor's opinion after the custody trial was very brief, we will quote it in full:

"Gentlemen, I have, of course, heard all of the testimony in connection with the original trial of this case, which consumed a couple of days, and I have had the benefit of reviewing that transcript, and I have had the benefit of our custodial investigation in connection with the three children.

"It's obvious to me that Mr. Davis can and has provided an adequate or even more than adequate home for the two older children, and certainly on the basis of their latest report cards, and the custodial investigation report they are doing well with him.

"It's equally obvious to me that Mrs. Davis is able to and has been providing an adequate home for the youngest daughter, Leigh. It's quite obvious to me that she would be unable to remain where she is if the Court awarded her custody of all three of the children, but I don't intend to do that, so it's not necessary to really even discuss that aspect of the case.

"The primary concern of the Court in this particular case has been the younger child, Leigh, who has been with her mother, and as to whether that should be at least a temporary, permanent arrangement, or whether the custody should be changed to the father.

"Being aware of the law in reference to the adultery of the mother and the presumptions that arise from it, at the same time we must consider that the law in the State of Maryland is, and has been for some time, that the best interests of the child is the paramount consideration that the Court should consider.

"The present situation, obviously whenever a father and mother are divorced, and children are separated, is not very desirable. At the same time, for a substantial period of time, well in excess of a year, the present arrangement has been in effect, and has apparently been working. That is not to say that if Mr. Davis had had Leigh during that period of time that she might not have made the same progress in school, and in her upbringing as she has with her mother. At the same time, the Court, based on all the information in this case, is reluctant at this point to make any change in the

custody of Leigh, because I think that that would not be in her best interests.

"Now, I am mindful though of the fact that, and as you had indicated, Mr. Foley, this is something that the Court has the right to review, and I would certainly expect to review it very carefully if at any time any information was brought to the Court's attention that she was, Mrs. Davis was conducting herself in any way that made it inadvisable to keep the custody of Leigh with her."

It hardly requires citation of authority to state the cardinal rule in custody cases is the welfare of the child. The rule is mentioned in every such case. In *Sullivan v. Auslaender*, 12 Md. App. 1, 3-5, 276 A. 2d 698 (1971), this Court carefully reviewed the decisions of the Court of Appeals and determined that in making this determination an appellate court is not bound by the clearly erroneous rule, Md. Rule 1086, but must exercise its own good judgment as to whether the conclusion of the chancellor is the best one. In making this determination we, of course, accept the chancellor's factual findings but not necessarily his conclusions. *Sartoph v. Sartoph*, 31 Md. App. 58, 64, 354 A. 2d 467 (1976). To guide us in making determinations a number of rules have been developed, one of which is that the custody of a child should not be disturbed unless there is strong reason affecting the welfare of the child. *Krebs v. Krebs*, 255 Md. 264, 257 A. 2d 428 (1969), *Vernon v. Vernon*, 30 Md. App. 564, 354 A. 2d 222 (1976). Split custody is frowned upon. *Bryce v. Bryce*, 229 Md. 16, 181 A. 2d 455 (1962). Another rule is that an adulterous parent is presumed to be unfit, *Palmer v. Palmer*, 238 Md. 327, 331, 207 A. 2d 481, 483 (1965); *Hild v. Hild*, 221 Md. 349, 358, 157 A. 2d 442, 447 (1960); *Pangle v. Pangle*, 134 Md. 166, 170, 106 A. 337, 338 (1919); *Widdoes v. Widdoes*, 12 Md. App. 225, 235, 278 A. 2d 100, 105 (1971). This presumption of unfitness can be overcome by showing that the adulterous party has repented, has terminated the relationship and has changed his or her ways so that there is little likelihood of a reoccurrence of the past conduct. *See* for examples:

*Neuwiller v. Neuwiller,* 257 Md. 285, 262 A. 2d 736 (1970); *Kauten v. Kauten,* 257 Md. 10, 261 A. 2d 759 (1970); *Sartoph v. Sartoph, supra; Powers v. Hadden,* 30 Md. App. 577, 353 A. 2d 641 (1976). It is the rare case in Maryland that has awarded custody to an adulterous parent, absent a showing that the wayward conduct had terminated. In each case there are most unusual circumstances.[2] In the instant case the appellee argues that inasmuch as the last adultery shown by the record occurred in November of 1974 and the hearing as to custody did not occur until December 11, 1975, this alone showed that the relationships have been terminated. We do not view the evidence in that manner. The appellant was granted his divorce on July 7, 1975, and the question of custody was reserved until after the hearing on December 11, 1975, the final order having been signed on January 5, 1976. It seems apparent to us that the appellant after having overwhelmingly demonstrated the wife's wayward manner could rely on the fact that it would be up to her to show a change in the course of her conduct; indeed, the cases place such a burden on the adulterous parent. *See Widdoes v. Widdoes, supra* at 237, 238. We note that in her testimony the appellee failed to discuss in any manner her adulteries or any change in her way of life. In a situation as we have here where the past indiscretions of the appellee are flagrant it became necessary for her to demonstrate that the opportunity and privilege of raising Leigh were more important than this type of conduct. A showing that she had

---

2. In Pratt v. Pratt, 245 Md. 716, 228 A. 2d 611 (1967), the Court did not expressly find that the adulteress had repented her ways but the evidence revealed that a thirteen year old daughter had expressed an intense dislike for her father and indicated that she would refuse to live with him under any circumstances. Custody of a two year old son was also granted to the wife because (1) he had always been properly cared for by her, (2) of the policy against dividing custody, and (3) the husband failed to substantiate that he and his relatives could provide a good home. In Orndoff v. Orndoff, 252 Md. 519, 250 A. 2d 627 (1969), it was found that the evidence of the adultery was unpersuasive but the Court of Appeals went on to say that even if the illicit conduct had been established the lower court would not have been in error in finding for the wife. The lower court had found, however, that the appellant's petition had been motivated by a desire to punish the mother for her transgressions rather than out of love for the child. In Mullinix v. Mullinix, 12 Md. App. 402, 278 A. 2d 674 (1971), the Court found that the chancellor's decree prohibiting contact between the adulteress and her paramour insured that she would change her ways.

repented and there was little likelihood of a recurrence of these actions was mandatory. We, therefore, find that the chancellor was erroneous in his determination that the best interest of the child required that custody be continued in the mother. As has often been pointed out, award of custody of a child is not to punish the errant parent but simply to look after the best interest of the child. In applying the rule that the custody of a child should not be disturbed, the chancellor avoided disturbing the relationship between the child and mother which had been long continued; however, he failed to consider the long term effect of having a child taught her sexual morals by an unrepentant, flagrantly adulterous and promiscuous parent. We think the long term effect of the latter is more important to the child than the temporary trauma which will be caused by her separation from her mother. We leave it to the parties to work out their own visitation rights which, of course, the chancellor can assure if such an agreement is not possible.

> *Order awarding custody of Katherine Leigh Davis to appellee reversed and custody awarded to appellant.*
>
> *Appellant to pay the costs.*