MONTGOMERY COUNTY DEPARTMENT OF SOCIAL
SERVICES, ET AL. *v.* REBECCA SANDERS

[No. 943, September Term, 1977.]

*Decided January 10, 1978.*

The cause was argued before GILBERT, C. J., and ■MENCHINE and LOWE, JJ.

*Adam J. Wojciak, Jr., Assistant County Attorney,* with whom was *Richard S. McKernon, County Attorney for Montgomery County,* on the brief, for appellant Montgomery County, Maryland. *William G. Simmons* for appellant Edwin Owen Sanders, Jr. *Gilbert E. Tietz* for other appellant.

*Mark Colvin* and *George E. Burns, Jr., Assistant Public Defenders,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

The United Nations Declaration states that "[m]ankind owes to a child the best it has to give." Very few persons will quarrel with the tenor of that assertion. What gives rise to controversy is not the general proposition of mankind's obligation to provide what is best for the child, but rather, what is best. The theoretical best mankind can provide is not always the best that society, through its courts, can implement. Consistently, the courts of Maryland have endeavored, in custody cases, to look to the "best interest" of the child. *See e.g., Ross v. Hoffman,* 280 Md. 172, 175, 372 A. 2d 582, 585 (1977); *DeGrange v. Kline,* 254 Md. 240, 243, 254 A. 2d 353, 354 (1969); *Kline v. Bennett,* 245 Md. 674, 678, 225 A. 2d 863, 865 (1967); *Butler v. Perry,* 210 Md. 332, 342, 123 A. 2d 453, 458 (1956); *Trudeau v. Trudeau,* 204 Md. 214, 218, 103 A. 2d 563, 564 (1954); *In re Harris,* 200 Md. 300, 310, 89 A. 2d 615, 619 (1952); *Ross v. Pick,* 199 Md. 341, 351, 86 A. 2d 463, 468 (1962); *Miller v. Miller,* 191 Md. 396, 407, 62 A. 2d 293, 298 (1948); *Dietrich v. Anderson,* 185 Md. 103, 116-17, 43 A. 2d 186, 191-92 (1945); *Kartman v. Kartman,* 163 Md. 19, 22, 161 A. 269, 270 (1932); *Barnard v. Godfrey,* 157 Md. 264, 267, 145 A. 614, 616 (1929). Courts, however, are limited to the framework of that which is available in each particular case.

In the case now before us, the Montgomery County

Department of Social Services (MCDSS) and Edwin Owen Sanders, Jr., seek to have us place judicial imprimatur upon the socio-psychological concept of "the psychological parent," J. Goldstein, A. Freud, A. Solnit, *Beyond the Best Interests of the Child* 7 (1973), as *the* paramount factor in awarding custody. On the other hand, the biological mother, Rebecca Sanders, asks that we reject outright that approach to custody determination. We shall neither sweepingly commend nor condemn the "psychological parent" concept in custody proceedings, but we expressly limit our holding in the particular circumstances of the case *sub judice* to declaring that the award to the psychological parent is not in the best interest of the child.

The child, Christopher Robyn Sanders, was only ten (10) months old when his mother, the appellee, Mrs. Rebecca Sanders, took him, on January 3, 1976, to Walter Reed Hospital for treatment of what she believed to be a viral infection. The hospital records, however, indicate that the actual cause of Christopher's debilitated condition was a "fractured left clavicle, first left rib fracture, older fracture of right femur, older chipped fracture of left femur, periosteal elevation of the left humerus, multiple bruises, bite mark on left cheek, scratch marks on right abdomen, and old bruises on the head." This shocking physical condition of the child prompted the MCDSS to petition the District Court for Montgomery County for Juvenile Causes to declare Christopher a "Child in Need of Assistance." The petition was filed pursuant to the Md. Cts. & Jud. Proc. Code Ann. § 3-801 (e) (2) (1974).[1]

Following an emergency hearing on January 26, 1976, the court ordered Christopher removed from his parents'

---

1. Section 3-801 (e) (2) of the Md. Cts. & Jud. Proc. Code Ann. states in pertinent part:

"(e) *'Child in need of assistance'* is a child who requires the assistance of the court because

. . .
(2) His parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and his problems provided, however, a child shall not be deemed to be in need of assistance for the sole reason he is being furnished nonmedical remedial care and treatment recognized by State law."

custody, placed under the jurisdiction of the court, and committed to MCDSS "for temporary shelter care."

On April 26, 1976, an adjudicatory hearing was held, and Judge John C. Tracey found that Christopher's best interest and welfare would be served by his continuing, temporarily, in his foster home with Mr. and Mrs. Ernest Shepard. At a subsequent dispositionary hearing, July 2, 1976, Judge Tracey reaffirmed Christopher's commitment to MCDSS.

Evidence presented at both the adjudicatory and the dispositionary hearings indicated that the appellee, Rebecca Sanders, was not the cause of Christopher's injuries. Mr. Edwin Sanders, Jr., apparently ignorant of the old maxim, *"patria potestas in pietate debet, non in atrocitate, consistere,"* [2] admitted biting his son on the face as a disciplinary measure because the infant child had bitten him on the ear.[3] Sanders also testified that he may have been too rough in his expressions of paternal affection, which may have resulted in physical injury to the child.

Dr. Frederick Ruyman, Assistant Chief of the Department of Pediatrics at Walter Reed Hospital testified that the cause of the fracture of the left clavicle could have been a severe fall. Similarly, the fractures of the left tibia and humerus could have been caused by Mr. Sanders' pulling and twisting Christopher's arm in the course of "rough play." Sanders told the court that although he believed his wife failed to care properly for their son he had never seen her strike or attempt to harm the child.

A polygraph test, administered to Rebecca Sanders on February 25, 1976, confirmed that she had neither knowledge of, nor was responsible for, her baby's injuries. Moreover, Mrs. Sanders contradicted her husband's allegations of neglect and offered evidence that she kept Christopher well

2. The English translation reads:

"Parental authority should consist or be exercised in affection, not in atrocity."

3. Sanders testified, "I've always been taught, even from my childhood, that, you know, once you bite a person, bite them back. And that usually breaks them of the habit. But I did not want to bite Chris on the ear for fear that I might hurt his ear. So I bit him on the cheek. Well, I didn't think that I had bitten him that hard on the cheek."

fed and clothed, and that she never left him unattended for extended periods of time.

During Christopher's enforced absence in 1976, Mrs. Sanders made a good-faith effort to create an environment for her son which would meet with the approval of MCDSS. She, having moved to Toledo, Ohio, entered a counselling program under the auspices of the Family Services of Toledo. Her counselling sessions were later expanded into a full therapy program. Mrs. Sanders also retained a pediatrician specializing in abuse cases to examine Christopher periodically after his return to her custody.

Mrs. Sanders's movement to the home of her parents in Ohio was caused by her separation from her husband in 1976 and resulting severe financial problems. The combined effect of her almost dire financial plight and the fact that she was experiencing a difficult pregnancy [4] prevented Mrs. Sanders from travelling to Maryland and visiting Christopher. Nevertheless, inferentially, she telephoned the MCDSS weekly to inquire about her son.

On October 15, 1976, appellee filed a "Petition for Change of Placement of Minor Child to the Natural Mother." At the hearing in January 1977, Mrs. Sanders testified that she was continuing her therapy and was willing to consult additional psychologists or psychiatrists if so ordered by the court. Her expectations concerning Christopher's homecoming were realistic, and she recognized that a period of adjustment would be involved.

The record reveals that during her residency in Ohio, prior to the October hearing, appellee completed five (5) courses at the University of Toledo Community College, including one on child development in which she said that she received a grade of "A." She aspires to attain an associates degree in social service technology. As part of the academic requirements, she has been working with and observing young children. Dr. Robert A. Wilson, Chairman of the Department of Social Behavior at Columbia Union College,

---

4. The record indicates that Mrs. Sanders gave birth in September 1976, and the child was either still-born or died shortly after birth. No explanation is supplied in the record as to the cause of death, but, in any event, no finger of suspicion has been pointed toward Mrs. Sanders.

offered expert testimony, in July 1977, that Mrs. Sanders is capable of putting her newly acquired knowledge on child rearing into practice.

The appellee is a devout Seventh Day Adventist and has been assisting children under the age of four (4) years in her church's Sunday school program. Additionally, she has been babysitting the infant son of a friend. Mrs. Sanders has arranged for a babysitter to watch Christopher while she attends classes at the Community College. Efforts have also been made by her to obtain employment and to secure public housing.

Among the original reasons set forth by MCDSS for opposing transfer of custody back to Mrs. Sanders is the possibility of Christopher's living with his maternal grandparents, the Bilbys. MCDSS has expressed reservations concerning the suitability of the Bilby home as a temporary shelter for the child. Social Services' reports characterized Mr. Bilby as nervous, defensive and hostile. Mr. Bilby's attitude, in light of his strong belief that his grandchild had been unjustly removed from the family unit, is not completely indefensible. The Social Services' description of Mr. Bilby must also be balanced against the fact that he holds a responsible job as a vocational high school teacher, is deeply concerned over the welfare of his family, and displays no propensity for violence. There is absolutely nothing in the record to cause one to suspect that he would ever harm his grandson. The reports pictured the grandmother, Mrs. Bilby, as a patient, intelligent woman with deep religious convictions. She indicated a willingness to resign her job, a clerical position, in order to spend extra time assisting her daughter in caring for Christopher. The Bilbys have also offered financial aid to their daughter and grandson.

On petition, the court appointed an attorney to represent "the best interest and welfare" of Christopher. Md. Cts. & Jud. Proc. Code Ann. § 2-102 (a) (1974).[5] Review hearings

---

5. Md. Cts. & Jud. Proc. Code Ann. § 2-102 (a) (1974) provides:

"If advisable in a specific proceeding, a court may appoint an auditor, surveyor, court reporter, assistant counsel for the state, *counsel for a party if authorized by law or rule* ... and may require his presence in court." (Emphasis supplied.)

were held on June 14, June 15, July 20, and July 28, 1977. In the course of the July 20, 1977 hearing, Dr. James Harrell, Chief Psychologist and Coordinator of Mental Health Services for the Montgomery County Health Department, testified that persons "equal[ly] or more so psychologically distressed" than the appellee function adequately as parents. He rendered no opinion as to which home, the appellee's or the foster parents', would prove to be the "best of possible worlds" [6] for Christopher.

The hearings before Judge Tracey also disclosed that MCDSS had determined as early as December 1976 that Christopher should never return to his biological mother. It is clear that MCDSS's determination to oppose Christopher's return to the custody of his mother was not a reflection on Mrs. Sanders's culpability, or lack thereof, for her son's injuries or upon her ability to care for him adequately. The justification for MCDSS's unbending stand is, as we have previously indicated, the socio-psychological theory called "psychological parenthood" espoused by Joseph Goldstein, Anna Freud, and Albert J. Solnit,[7] in their book, *Beyond the Best Interests of the Child.* Under the "psychological parenthood" principle, separation from the natural parent for a sufficient length of time saps the bond of love and affection between child and parent while simultaneously forging a strong psychological link which joins the child to a surrogate parent. Under those given circumstances, the surrogate parent becomes the "psychological parent," the one to whom the child turns for security, love, and a sense of emotional well-being. After the shift of allegiance by the child to the "psychological parent" is completed, a return to the biological parent would, theoretically, result in severe emotional trauma, detrimental to the child's best interests. In the case of a child under five (5) years of age, such as Christopher, the authors of *Beyond the Best Interests of the Child* opine that a two (2) month time frame severs forever all psychological

---

6. Voltaire (1694-1778), *Candide,* ch. 1 (1759). As used by James Branch Cabell (1879-1958) in *The Silver Stallion,* ch. 26 (1926) the phrase reads "the best of *all* possible worlds." (Emphasis supplied.)

7. Joseph Goldstein, Law School, Yale University.
Anna Freud, Hampstead Child-Therapy Clinic.
Albert J. Solnit, Child Study Center, Yale University.

ties to the natural mother. J. Goldstein, A. Freud, A. Solnit, *Beyond the Best Interests of the Child* 41 (1973). Seemingly, because Christopher was ignorant of that theory, he continued to call Rebecca Sanders "mother" long after the two (2) month deadline had passed. MCDSS apparently arbitrarily changed the time frame to six (6) months instead of the two (2) advocated by Goldstein, Freud, and Solnit. For whatever unexplained reasons, MCDSS chose not to enlighten appellee on either the six (6) or two (2) month theories and their dire consequences. Thus, even if Mrs. Sanders grew and developed into a paragon of motherhood, she still could never reclaim Christopher because of the attachment formed by the infant to the "psychological parent."

When MCDSS presented the theory to Judge John C. Tracey on July 20, 1977, he reacted with caution and skepticism. Judge Tracey said:

"To accept the standard of the 'best interest theory' as presented by the . . . [MCDSS], based upon the book by Dr. Goldstein, Dr. Freud, and Dr. Solnick, [sic] *'Beyond the Best Interest* [sic] *of the Child'*, without regard to the circumstances for the original taking of the child by the social agency or of the conditions of the mother at that time and during the process of these proceedings, and based solely on the time element to establish the 'psychological parents', after which time, 'six months is excessive' as set forth in the testimony of Dr. Paul Glass, [Chief of the Section of Child Mental Health for the Health Department of Montgomery County] places an impossible burden on any natural parent which may well lead to a disincentive for agencies and foster families to provide a positive program to the natural parents of help and services which could possibly lead to the return of the child to his or her biological parent. To accept as a certainty a theory presented within *'Beyond the Best Interest* [sic] *of the Child'*, knowing the uniqueness of each factual situation, the fragmentation of services offered by . . . [MCDSS], the lack of a positive re-enforcement

program to natural parents in all cases, the present apparent lack of co-ordination of services in these proceedings by the evaluators, the workers, the diagnosticians, and by the Court, would be totally untenable and are not supported by the facts and evidence presented in these proceedings."

Judge Tracey then proceeded to return custody of Christopher to his biological mother, the appellee. On August 8, 1977, this Court granted a Stay of Final Order Pending Appeal.

Unfortunately, there is no such thing as "a simple custody case," for as we articulated in *Mullinix v. Mullinix,* 12 Md. App. 402, 412, 278 A. 2d 674, 679 (1971), "[c]ustody cases are like fingerprints because no two are exactly the same." B. Botein, in his book, *Trial Judge,* correctly declares, "[a] judge agonizes more about reaching the right result in a contested custody issue than about any other type of decision he renders." B. Botein, *Trial Judge* 273 (1952). The Court cannot simply appraise both parties and cavalierly Solomonize the child by dividing "the living child in two, and giv[ing] half to the one, and half to the other." I Kings 3:25.

The Supreme Court has termed the right to rear one's child "essential," *Meyer v. Nebraska,* 262 U. S. 390, 399, 43 S. Ct. 625, 626, 67 L. Ed. 1042, 1045 (1923), and one of the "basic civil rights of man." *Skinner v. Oklahoma,* 316 U. S. 535, 541, 62 S. Ct. 1110, 1113, 86 L. Ed. 1655, 1660 (1942). Child rearing constitutes a right "far more precious ... than property rights." *May v. Anderson,* 345 U.S. 528, 533, 73 S. Ct. 840, 843, 97 L. Ed. 1221, 1226 (1953). The custody right of the biological parents is not unfettered because of the *parens patriae* power of the State to protect its younger citizens from abuse and neglect. *Dietrich v. Anderson,* 185 Md. at 116, 43 A. 2d at 191.

The authority of the State to remove a child from the home into which he was born is firmly entrenched in Anglo-American law. Under the early English common law, the *pater familias* was entitled to the custody of his offspring as an absolute legal right regardless of the welfare of the

child.[8] Thomas, *Child Abuse and Neglect Part I: Historical Overview, Legal Matrix, and Social Perspectives,* 50 N.C.L. Rev. 293, 299 (1972); Note, *Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties,* 73 Yale L. J. 151 (1963). *See Ross v. Hoffman,* 280 Md. at 176, 372 A. 2d at 586.

The father's right to custody of his child was brought to the "New World" in a somewhat diluted form. Colonial courts fused the father's right to his duty to furnish discipline and support. Thomas, *Child Abuse and Neglect Part I: Historical Overview, Legal Matrix, and Perspectives,* 50 N.C.L. Rev. 293, 299-300 (1972). *See generally* 2 J. Kent, *Commentaries on American Law* 203-05 (11th ed. 1867). When a parent failed to execute those duties properly, the government could authorize a suitable person to take charge of the child and function as guardian.[9] *See Dietrich v. Anderson,* 185 Md. at 116, 43 A. 2d at 191; *Chapsky v. Wood,* 26 Kan. 650, 652-53, 40 Am. Rep. 321, 322 (1881). *See generally* 2 J. Kent, *Commentaries on American Law* 203-05 (11th Ed. 1867).

> "[A]lthough, in general, parents are intrusted with the custody of the persons, and the education of their children, yet this is done upon the natural presumption, that the children will be properly taken care of, and will be brought up with a due education in literature, and morals, and religion; and that they will be treated with kindness and affection. But, whenever this presumption is removed; whenever (for example) it is found, that a father is guilty of gross ill treatment or cruelty towards his infant children; or that he is in constant habits of

---

8. It was not until the Victorian Era that a father lost a custody dispute in England. The dubious award for "first loser" was presented to the famous poet, Percy Bysshe Shelley (1792-1822), by Lord Eldon in Shelley v. Westbrooke, 37 Eng. Rep. 850 (Ch. 1817). Lord Eldon described Shelley's atheistic beliefs as vicious and immoral and refused to give him custody of his children.

9. The Seventeenth Century laws of Massachusetts, Connecticut, and Virginia specifically authorized local magistrates to indenture children of the indigent despite parental objections. Mnookin, *Child Custody Adjudication: Judicial Functions in the Face of Indetermacy,* 39 Law & Contemp. Prob. 226, 240 (Summer 1975).

416

drunkenness and blasphemy, or low and gross debauchery; or that he professes atheistical or irreligious principles; [10] or that his domestic associations are such as tend to the corruption and contamination of his children; in every such case the Court of Chancery will interfere and deprive him of the custody of his children, and appoint a suitable person to act as guardian, and to take care of them, and to superintend their education." 2 J. Story, *Commentaries on Equity Jurisprudence* 702 (7th ed. 1857) (Footnotes omitted.)

"This principle is based upon the theory that, while the law of nature gives to parents the right to the custody of their own children, a child from the time of birth owes allegiance to the State, and the State in return is obligated to regulate the custody of the child whenever necessary for its welfare." *Ross v. Pick*, 199 Md. at 351, 86 A. 2d at 468;

Accord, Dietrich v. Anderson, 185 Md. at 116, 43 A. 2d at 191.

Growing concern for the welfare of the child and the fading, if not absolute disappearance, of the concept of the child as parental property has led to a gradual modification in judicial attitude and approach in custody matters. *United States v. Green,* 26 Fed. Cas. 30, 31-32 (No. 15256) (C.C.R.I. 1824); *In re Bort,* 25 Kan. 308, 309-10, 37 Am. Rep. 255, 256-57 (1881). While there is a school of thought that shelves sentiment and ignores the old shibboleth that "bluid is thicker than water," [11] Maryland has remained loyal to the common law presumption that the right of either natural, inter-married parent is generally superior to that of a third party. *Ross v. Hoffman,* 280 Md. at 177-79, 372 A. 2d at

10. Mr. Justice Story's pronouncement that atheists or persons with "irreligious principles" are unfit parents is without the ambit of the First Amendment. The Constitutional right to Freedom of Religion carries with it the concommitant right to "freedom from religion." *See* Epperson v. Arkansas, 393 U. S. 97, 89 S. Ct. 266, 21 L.Ed.2d 228 (1968); Daniel v. Waters, 515 F. 2d 485, 490 (1975) *on remand,* 399 F. Supp. 510 (1975). *See generally* Watson v. Jones, 80 U. S. (13 Wall.) 679, 728, 20 L. Ed. 666, 676 (1871).

11. Sir Walter Scott (1771-1832), in *Guy Mannering* ch. 38 (1815), used the word "bluid" not the current "blood."

586-87; *DeGrange v. Kline,* 254 Md. at 242-43, 254 A. 2d at 354; *Melton v. Connolly,* 219 Md. 184, 188, 148 A. 2d 387, 389 (1959); *Trenton v. Christ,* 216 Md. 418, 420, 140 A. 2d 660, 661 (1958); *Ross v. Pick,* 199 Md. at 351, 86 A. 2d at 468; *In re McNeil,* 21 Md. App. 484, 497, 320 A. 2d 57, 64 (1974). *See also* 2 J. Kent, *Commentaries on American Law* 203-05 (11th ed. 1867).[12]

> "When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child." *Ross v. Hoffman,* 280 Md. at 178-79, 372 A. 2d at 587.

*See also Thumma v. Hartsook,* 239 Md. 38, 41-42, 210 A. 2d 151, 152-53 (1965); *Ross v. Pick,* 199 Md. at 351, 86 A. 2d at 468.

The burden is cast upon those opposing the natural parents to prove that remaining with the biological family would be deleterious to the child's best interest. *DeGrange v. Kline,* 254 Md. at 242-43, 254 A. 2d at 354; *Trenton v. Christ,* 216 Md. at 420, 140 A. 2d at 661; *Ross v. Pick,* 199 Md. at 351, 86 A. 2d at 468.

In this State, resolving disputes over child custody is a function of the equity courts. *Ross v. Hoffman,* 280 Md. at 174, 372 A. 2d at 585; *Mullinix v. Mullinix,* 12 Md. App. at 409, 278 A. 2d at 678.

> "The jurisdiction of a court of equity includes the custody, maintenance, visitation and support of a child. The court may direct who shall have the custody of a child, decide who shall be charged with its support and maintenance, and determine who

---

12. *See generally* Stanley v. Illinois, 405 U. S. 645, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); Marshall v. Stefanides, 17 Md. App. 364, 302 A. 2d 682 (1973).

shall have visitation rights. This jurisdiction is a continuing one, and the court may from time to time set aside or modify its decree or order concerning the child." *Ross v. Hoffman,* 280 Md. at 174, 372 A. 2d at 585.

*See also Barnard v. Godfrey,* 157 Md. at 267, 145 A. at 616; Note, *Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties,* 73 Yale L. J. 151, n. 3 (1963). The court of equity "stands as a guardian of all children, and may interfere at any time and in any way to protect and advance their welfare and interests." *In re Bort,* 25 Kan. at 310, 37 Am. Rep. at 257.

> "The chancellor in exercising his jurisdiction . . . does not proceed upon the theory that the petitioner, whether father or mother, has a cause of action against the other or indeed against anyone. He acts as *parens patriae* to do what is best for the interest of the child. . . . He is not adjudicating a controversy between adversary parties, to compose private differences. . . . Equity does not concern itself with such disputes in their relation to the disputants. Its concern is for the child." [13] *Finlay v. Finlay,* 240 N. Y. 429, 433-34, 148 N. E. 624, 626 (1925).

Although at one time this Court believed itself free, based upon language in *Melton v. Connolly,* 219 Md. at 188, 148 A. 2d at 389, and *Butler v. Perry,* 210 Md. 332, 339-40, 123 A. 2d 453, 456 (1956), to substitute our judgment for that of the chancellor in custody disputes, *Sullivan v. Auslaender,* 12 Md. App. 1, 3, 276 A. 2d 698, 699-700 (1971), we were told most emphatically in *Davis v. Davis,* 280 Md. 119, 372 A. 2d 231 (1977), *reversing* 33 Md. App. 295, 364 A. 2d 130 (1976), that our scope of review is limited to whether the trial judge abused his discretion or whether his findings of fact are clearly erroneous. The chancellor's findings of fact are to be given great weight since he has the parties before him and has "the best opportunity to observe their temper,

---

13. We opined in Mullinix v. Mullinix, 12 Md. App. at 411, 278 A. 2d at 679, that a child is not a prize or award that is presented to the unerrant parent.

temperament and demeanor, and so decide what would be for the child's best interest . . . ." *Kartman v. Kartman,* 163 Md. at 23, 161 A. at 270. *See e.g., Holcomb v. Holcomb,* 255 Md. 86, 87-88, 256 A. 2d 886, 887 (1969); *Daubert v. Daubert,* 239 Md. 303, 309, 211 A. 2d 323, 327 (1965); *Trudeau v. Trudeau,* 204 Md. at 218, 103 A. 2d at 564; *Sibley v. Sibley,* 187 Md. 358, 362, 50 A. 2d 128, 130 (1946); *Mullinix v. Mullinix,* 12 Md. App. at 412, 278 A. 2d at 679. There can be very little constructive or useful precedent on the subject of custody determinations, because each case must depend upon its unique fact pattern. *Id.; Barnard v. Godfrey,* 157 Md. at 267-68, 145 A. at 616. "That is why we must afford great weight to the Chancellor's opportunity to see and hear the witnesses, . . . inasmuch as we are supplied with only the transcribed testimony." *Mullinix v. Mullinix,* 12 Md. App. at 412, 278 A. 2d at 679. (Citations omitted.) *Accord, Dinkel v. Dinkel,* 322 So. 2d 22, 23 (Fla. 1975). This Court may not set aside the factual findings of the chancellor unless they are clearly erroneous, *Davis v. Davis,* 280 Md. 119, 372 A. 2d 231 (1977), *reversing* 33 Md. App. 295, 364 A. 2d 130 (1976), and absent a clear showing of abuse of discretion, the decision of the trial judge in a custody case will not be reversed. *Id.*

Where modification of a custody award is the subject under consideration, equity courts generally base their determinations upon the same factors as those upon which an original award was made, that is, the best interest of the child. Unfortunately, there is no litmus paper test that provides a quick and relatively easy answer to custody matters. Present methods for determining a child's best interest are time-consuming, involve a multitude of intangible factors that ofttimes are ambiguous. The best interest standard is an amorphous notion, varying with each individual case, and resulting in its being open to attack as little more than judicial prognostication. The fact finder is called upon to evaluate the child's life chances in each of the homes competing for custody and then to predict with whom the child will be better off in the future. At the bottom line, what is in the child's best interest equals the fact finder's best guess.

What critics of the "judicial prognostication" overlook is that the court examines numerous factors and weighs the advantages and disadvantages of the alternative environments. *See Chapsky v. Wood,* 26 Kan. at 655, 40 Am. Rep. at 325. The court's prediction is founded upon far more complex methods than reading tea leaves. The criteria for judicial determination includes, but is not limited to, 1) fitness of the parents, *Cornwell v. Cornwell,* 244 Md. 674, 224 A. 2d 870 (1966); *Barnard v. Godfrey,* 157 Md. 264, 145 A. 614 (1929); 2) character and reputation of the parties, *Hoder v. Hoder,* 245 Md. 705, 227 A. 2d 750 (1967); 3) desire of the natural parents and agreements between the parties, *Breault v. Breault,* 250 Md. 173, 242 A. 2d 116 (1968); *McClary v. Follett,* 226 Md. 436, 174 A. 2d 66 (1961); *Colburn v. Colburn,* 20 Md. App. 346, 316 A. 2d 283 (1974); *Davis v. Jurney,* 145 A. 2d 846 (D.C. Mun. App. 1958); 4) potentiality of maintaining natural family relations, *Lippy v. Breidenstein,* 249 Md. 415, 240 A. 2d 251 (1968); *Melton v. Connolly, supra; Piotrowski v. State,* 179 Md. 377, 18 A. 2d 199 (1941); 5) preference of the child, *Ross v. Pick,* 199 Md. at 353, 86 A. 2d at 469; *Young v. Weaver,* 185 Md. 328, 44 A. 2d 748 (1945); *United States v. Green,* 26 Fed. Cas. 30, 31-32 (No. 15256) (C.C.R.I. 1824); 6) material opportunities affecting the future life of the child, *Thumma v. Hartsook, supra; Butler v. Perry, supra; Cockerham v. The Children's Aid Soc'y of Cecil County,* 185 Md. 97, 43 A. 2d 197 (1945); *Jones v. Stockett,* 2 Bland. 409 (Ch. 1838); 7) age, health and sex of the child, *Alden v. Alden,* 226 Md. 622, 174 A. 2d 793 (1961); *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 919 (1949); *Piotrowski v. State, supra;* 8) residences of parents and opportunity for visitation, *Rzeszotarski v. Rzeszotarski,* 296 A. 2d 431, 440 (D.C. App. 1972); 9) length of separation from the natural parents, *Ross v. Hoffman, supra; Melton v. Connolly, supra; Powers v. Hadden,* 30 Md. App. 577, 353 A. 2d 641 (1976); and 10) prior voluntary abandonment or surrender, *Dietrich v. Anderson, supra; Davis v. Jurney, supra.*

While the court considers all the above factors, it will generally not weigh any one to the exclusion of all others. The court should examine the totality of the situation in the

alternative environments and avoid focusing on any single factor such as the financial situation, *Cockerham v. The Children's Aid Soc'y of Cecil County, supra,* or the length of separation. *Powers v. Hadden, supra.*

MCDSS, however, contends that in failing to apply the "psychological parenthood" theory to the exclusion of all else, Judge Tracey abused his discretion. In its well-intentioned zeal to lay down simple, definite criteria for ascertaining a child's best interest, MCDSS has oversimplified the problem. In effect, MCDSS has devised and advocates a formula based on *Beyond the Best Interests of the Child.* The adoption of the formula would reduce custody disputes to mathematical certainty. By adding a child's age to the time spent away from his natural parents, MCDSS arrives at the appropriate custody situs. Thus, in an exercise of basic algebraic principles, $A$ (age) $+ T$(time) $= C$(custody), all custody cases are easily mathematically resolved.

As with many seemingly simple solutions to complex problems, $A + T = C$ is not a panacea. Custody cases involve too many people, conditions, and human emotions to be reduced summarily to a mere mathematical process.[14] The intricacies of the many human relationships that are interwoven into each custody dispute defy the type of simplification proposed by MCDSS.

> "One may illustrate the essential idea by a spiderweb, pull a strand here, and a complex pattern of adjustments runs through the whole web. Pull another strand from a different angle, and another complex pattern results."

Fuller, *Collective Bargaining and the Arbitrator,* Wis. L. Rev. 3, 33 (1963). One patent fallacy in the $A + T = C$ formula is that it leaves no room for adjustments to individual situations.

We have previously rejected the notion of examining a

---

14. If the formula process were to become the law, custody would be determined by the psychologist or psychiatrist along with the social worker. The court would be reduced to the mere ministerial function of signing the order or decree.

child's age and time apart from his natural parents while ignoring every other aspect of the circumstances and personalities involved in the case. *Powers v. Hadden, supra.* Obviously, the length of time apart is a factor to be considered in weighing the merits of each potential home. *Id.* at 583, 353 A. 2d at 645.

> "[T]ies of blood weaken, and ties of companionship strengthen, by lapse of time. . . . Consequently, the longer the period of time required for a parent to prove reformation, the less chance he or she has to reclaim a lost child." *Id.*

Unrestrained application of the "psychological parenthood" theory can lead to absurd results as evidenced by the views espoused by Dr. Glass in his testimony in the instant case. A hypothetical was posed to the doctor in which a child was removed from his home by kidnappers and kept safe and well cared for by the criminals for an extended period of time. Dr. Glass said that it would be in the child's best interest to remain with the kidnappers since psychologically they would be his family. While the probability of the average youngster being carried off by kidnappers or gypsies is slight, the instance of natural, adoptive or foster parents fleeing the jurisdiction with a child they have been ordered to relinquish is growing increasingly common.[15] To allow a person to abscond with a child and then judicially condone the action after a pre-established time period has lapsed is to place a premium on disobedience of court orders and simultaneously to reduce the child to "personal property" to which any person can acquire some

---

15. The extent to which MCDSS carries the concept of "psychological parenthood" is illustrated by the following hypothetical question put to its counsel on oral argument. "Assume that a young widow with a ten (10) month old child contracts a highly contagious disease which requires her isolation for a period of six (6) months. Further assume that during that period of time the infant does not visit her and that the child is well cared for, including love and affection, by foster parents. Under those conditions, upon the young mother's release from the hospital should the infant be returned to her custody?" The answer of counsel was, "No" because of the psychological parent relationship that would have sprung up between child and foster parent. Counsel did, however, say that under the fact pattern he would recommend to the county that it pay for closed circuit television visitation between mother and child.

sort of "squatter's rights." *Bennett v. Jeffreys,* 40 N.Y.2d 543, 552, n. 2, 356 N.E.2d 277, 285, n. 2, 387 N.Y.S.2d 821, 829, n.2 (1976).

> "The resolution of cases must not provide incentives for those likely to take the law into their own hands. Thus, those who obtain custody of children unlawfully, particularly by kidnapping, violence, or flight from the jurisdiction of the courts, must be deterred. Society may not reward, except at its peril, the lawless because the passage of time has made correction inexpedient." *Id.* at 550, 356 N.E.2d at 284, 387 N.Y.S.2d at 827.

Evidence offered by social workers, psychologists and psychiatrists may be necessary in custody cases. The equity court, however, is entitled to weigh that evidence along with contradictory testimony and its own observations. Reliance upon "the auxiliary services of psychiatrists, psychologists, and trained social workers ... should not be too obsequious or routine or the experts too casual." *Ross v. Hoffman,* 280 Md. at 191, 372 A. 2d at 594. Such reliance could lead the courts, in acts of misapplied psychology, to separate unjustly family members.

> "Particularly important is this caution where one or both parties may have the means to retain their own experts and where publicly compensated experts or experts compensated by only one side have uncurbed leave to express opinions which may be subjective or are not narrowly controlled by the underlying facts." *Bennett v. Jeffreys,* 40 N.Y.2d at 549, 356 N.E.2d at 283, 387 N.Y.S.2d at 827.

Caution is particularly apropos in the case *sub judice* where Mrs. Sanders was financially unable to match the weight of experts brought forth by the MCDSS.

The appellants stress that Christopher is now in a home offering superior material advantages. Mr. and Mrs. Shepard, his foster parents, appear to love the child and have expressed an interest in adopting him. Judge Tracey, however, was not

clearly erroneous in refusing to award custody to the MCDSS because of Mrs. Sanders's financial plight. The fact that parents are poor is not itself a reason for placing a child in foster care. *Cockerham v. The Children's Aid Soc'y of Cecil County,* 185 Md. at 101, 43 A. 2d at 199. Although the foster parents have expressed an interest in adopting Christopher, the trial court had no guarantee such adoption would be consummated. We point out that there is no requirement that the foster parents adopt Christopher, and that there is no assurance that Christopher will remain in the same foster home. To leave him in the "legal limbo," *Bennett v. Jeffreys,* 40 N.Y.2d at 551, 356 N.E.2d at 284, 387 N.Y.S.2d at 828, of foster care when an adequate, if not utopian, home is offered by the natural mother hardly seems to be in anyone's "best interest," much less the child's.

We think Judge Tracey's findings of fact were not clearly erroneous, if, indeed, they be erroneous at all. The evidence before the trial judge clearly substantiates Mrs. Sanders's claim that she was never the abuser, and that although the Sanders's home may once have been a dangerous environment for Christopher, such is no longer the case. "Conditions which might justify relieving a parent temporarily of the custody of his child would not necessarily support absolute and permanent transfer of the child to a stranger." *Roy v. Holmes,* 111 So. 2d 468, 470 (Fla. 1959).

MCDSS is legitimately concerned with preventing Christopher from once again falling victim to the battered child syndrome. Its concern, however, has been carried to the point of protecting Christopher from a danger that no longer exists.

> "[S]ocial workers sometimes develop 'rescue fantasies' in well-intended efforts to save helpless children from bad parents. These emotions tend to obscure objective evaluations of the strengths of the child's own home." Thomas, *Child Abuse and Neglect Part I: Historical Overview, Legal Matrix, and Social Perspectives,* 50 N.C.L. Rev. 293, 347 (1972).

The record reveals that Rebecca Sanders is now in a position to offer her son a safe, comfortable, loving home. The home will not be the theoretical ideal, but few households ever achieve such a lofty state. In Christopher's eyes, appellee is still the woman he thinks of as mother, and he should be reunited with her.

We hold that Judge Tracey did not abuse his discretion in directing the return of Christopher to the custody to his mother.

*Order affirmed.*
*Costs to be paid by appellants, Montgomery County Department of Social Services and Edwin Owen Sanders, Jr.*
*Mandate to issue forthwith.*